ARNOLD LIDDLE et al., Appellees, v. MAUD E. SALTER et al., Appellants.

WILLS: Validity—Undue Influence—Evidence. Direct evidence
1 of undue influence is not necessary. The condition of decedent's mind, the inequalities of the will, the lack of obligation of deceased to the principal devisee, the former strained relations between the testator and devisee, the precipitate way in which the devisee secured control of testator's property, and other like and attending circumstances, may amply present a jury question on the issue of undue influence.

WILLS: Validity—Undue Influence—Fiduciary Relations. Princi-
2 ple recognized that a presumption of undue influence does not arise from the fact that testator and devisee occupied fiduciary relations.

WILLS: Testamentary Capacity—Evidence—Non-Expert Opinion—
3 Trivial Facts. Non-expert opinions as to the sanity of testator, though in part based on apparently trivial circumstances, may be sufficient to create a jury question on the issue of mental competency when aided by the fact that testatrix was feeble, was an epileptic, was afflicted with hysteria, and had, by her conduct, manifested inability to keep control of her property.

WILLS: Testamentary Capacity—Non-Expert Opinions—Detail of
4 Facts. Evidence revealing a series of acts by testatrix, some apparently trivial and others concededly out of the ordinary, reviewed, and held to afford proper basis for non-expert opinions on the issue of insanity.

APPEAL AND ERROR: Assignment of Error—Sufficiency. An as-
5 signment of error which, if considered, would force the court to

wander aimlessly through the record in quest of errors, will be wholly disregarded. So held where the assignment was: "The court erred in admitting certain evidence offered by contestants and objected to by proponents as shown by the official reporter's notes."

WILLS: Validity—Undue Influence—Evidence—Acts and Statements by One of Several Devisees. Statements made and things done in the presence of a deceased testator, prior to the execution of a will or shortly thereafter, by one who was a devisee under the will, and who was accused of having exercised undue influence over testator in the execution of testator's will, and tending to show dominance over testator or a desire to persuade testator with reference to the disposition of his property, is admissible even though the one making the statements or doing the things is only one of *several* devisees under the will.

WITNESSES: Competency—Transaction with Deceased—Showing of Non-Participation by Witness. Conceding, *arguendo*, that, when an interested witness, within Section 4604, Code, 1897, is asked to detail a conversation had in the presence of a deceased, it should be first affirmatively shown that the witness did *not* participate in the conversation, yet permitting an answer without such showing is non-prejudicial when the answer revealed the fact that the witness did not participate.

APPEAL AND ERROR: Harmless Error—Improper Exclusion of Evidence—Subsequent Reception. Improper rejection of evidence followed by the subsequent reception of substantially the same evidence renders the former error harmless. So held as to the rejection of evidence bearing on the mental competency of a testatrix.

WILLS: Validity—Undue Influence—Instructions—Confusing Controlling and Non-controlling Elements. Instructions on an issue of undue influence which so confuse controlling and non-controlling elements as to render the instructions misleading and difficult of analysis, are wholly bad, and constitute error.

APPEAL AND ERROR: Harmless Error—Wills—Misleading Instruction—Affirmative Finding on Issues—Effect. An affirmative finding by a jury, under adequate evidence, that a will was the product of both mental incompetency and undue influence, may render confusing and misleading instructions harmless on such issue.

**TRIAL:** Verdict—Special Interrogatories—Non-Submission to Counsel—**Effect.** Special interrogatories properly submitted to the jury by the court *on its own motion* need not be first submitted to counsel for one of the parties even though counsel for the other party had asked submission of *substantially* the same interrogatories as given by the court. (Section 3727, Code, 1897.)

*Appeal from Black Hawk District Court.*— C. W. MULLAN, Judge.

TUESDAY, JUNE 26, 1917.

SARAH C. Gracely died testate August 20, 1914. The admission of her will to probate was contested and it set aside. The proponents appeal.—*Affirmed.*

*M. J. Butterfield* and *Mears & Lovejoy,* for appellants.

*Sager, Sweet & Edwards,* for appellees.

LADD, J.—Charles Gracely died January 3, 1914, leaving no issue, but leaving property valued at less than $7,500. This descended to his wife, Sarah C. Gracely, who died August 20th of the same year. She left personal property and realty, the latter estimated at $22,000, and in her will devised her home, valued at $6,000, to Maude E. Salter, an insurance policy on her life to her brother, Arnold Liddle, and directed that her executor reduce all other property to money and, after discharging debts, pay the First Church of Christ in Waterloo $300, Vance and Myrtle Salter, children of Maude E. Salter, $200 each, and directed that the residue be divided so as to give a sister of her husband's one third, a sister one third, and one ninth each to a nephew and two nieces of her deceased husband's. Maude E. Salter was designated as executrix. Upon the filing of this will, a brother, sister, and son of a deceased sister's filed objections to its admission to probate on the grounds that the testatrix was of unsound mind at the time of signing the will, and that it was procured through the un-

due influence of Mrs. Salter and her children. Exceptions are taken to 22 rulings on the admissibility of evidence, 2 instructions, the giving of 2 special interrogatories, and overruling a motion to direct a verdict for proponents.

1. WILLS: validity: undue influence: evidence.

I.   The sufficiency of the evidence to sustain the verdict may as well be disposed of at the outset, and first as to the evidence of undue influence.   The record is without direct evidence, as is usual in such cases, but the circumstances were such as to rightly carry this issue to the jury.

Decedent and her husband were without issue, their only child having died in infancy.  Besides a brother and sister, mentioned in the will, the son of a deceased sister survived testatrix.   Immediately after the death of her husband, her brother insisted that she take up her residence with him, but she could not leave the old home.  She invited Mrs. Breynan to live with her, but the latter declined, owing to then having a broken arm.  Miss Steinel came from Mrs. Salter's to stay with her a short time.  On January 16th, less than two weeks after her husband's death, P. C. Ritz, an attorney, an acquaintance of Mrs. Salter's, was invited by telephone to call at her house.  As decedent did not know him, it is fairly to be inferred that the message was from Mrs. Salter.  After some talk, decedent directed Ritz to prepare a power of attorney, which he did, and she executed it three days later.  It conferred upon Mrs. Salter power:

"(1)   To execute to other persons leases on any and all my real properties, which I may from time to time offer for rent.

"(2)   To ask, demand, sue for, collect and receive money and personal property for rents now due or which may become due on all leases oral and written, on all my

real property, given by me or my duly appointed agent to other persons.

"(3) To order, purchase and contract for such materials and labor as shall be necessary to make all necessary repairs and improvements on any or all of my real and personal property.

"(4) To guard and protect my interests in any and all of my property, both real and personal.

"(5) To sign checks on my deposits in the Security Savings Bank of Waterloo, Iowa, as follows: 'Mrs. Sarah C. Gracely by Mrs. Maude E. Salter, her Agent,' for amounts due from me for taxes and insurance on my real and personal property, for amounts due on account of repairs and improvements to my real and personal property, for amounts due on account of groceries, meats, clothing and all other necessities ordered by me.

"(6) It shall be the duty of Mrs. Maude E. Salter to deposit in my name all sums of money due me and belonging to me and collected by her from rents and otherwise, in the Security Savings Bank of Waterloo, Iowa. It shall be her further duty to keep all money belonging to me entirely separate from her own money. She must keep and render account of money and personal property received and paid out by her on my account and render an account to me when required. It shall be the further duty of this my agent to keep me posted as to all matters touching upon the premises, giving and granting unto my said attorney full power and authority to do and perform each and every act and thing whatsoever required and necessary to be done in and to the premises as fully as I might do or act, if personally present, reserving the right to revoke this power at my pleasure; and I hereby ratify and confirm all that my said attorney may legally do in the said premises by virtue hereof."

The record does not indicate whether Mrs. Salter had

had business experience to commend the reposing of such confidence. Certainly their previous relations furnish no explanation of what was done. It appears that decedent had been jealous of Mrs. Salter prior to the death of Gracely, at one time directing when he was sick that she be locked out of the house, remarking that all she wanted was "to come and rub Charles' leg for him." In view of this situation, it is hardly to be supposed that decedent, without the exercise of considerable influence, would have placed all her property in Mrs. Salter's control. But the control of the property did not suffice; and in February following, Ritz, as is testified by him, negotiated in decedent's behalf with Mrs. Salter, and, in pursuance of an understanding reached, prepared a lease for decedent's home for one year at a rental of $30 per month, and also a contract, by the terms of which Mrs. Salter was to give decedent the use of a room therein, the freedom of the premises, care and board and services under the power of an attorney, and in consideration thereof decedent was to pay her $75 per month. It should be added that Mrs. Salter had previously talked the matter over with decedent. These contracts were signed March 6th, and Mrs. Salter took possession on March 26th. On May 8th, a new lease and a new contract for board and care for a period of five years, though not to extend after the death of either party, were executed. But previous to this, on April 17th, care of property and person had culminated in the execution of the will in controversy. It also was prepared by the attorney selected by Mrs. Salter for the decedent, and he appears to have rewarded one of those witnessing the signing of the will by paying him $10, and the other, $5. Calls of the neighbors on Mrs. Gracely became less frequent. There was evidence that, upon leaving the house on several occasions, Mrs. Salter locked decedent in. The record also contains evidence of declarations of Mrs. Sal-

ter's. Mrs. Breynan testified to a conversation with Mrs. Salter, in which she was asked:

"Was there anything said at that time by Mrs. Salter in the presence of Mrs. Gracely about making a will? A. Yes, sir. Q. Go ahead and tell the jury what was said. A. Mrs. Salter said she advised her to make a will, and when she made one, to make it ironclad, and if she had three witnesses, it couldn't be broken. Q. Do you remember any other conversation at that time, in presence of Mrs. Gracely? A. Mrs. Salter told Mrs. Gracely that Mr. Gracely told her that, if he should die first, he would like to come back in a few days and see how Mrs. Gracely's relatives were scrapping for her money trying to get it away from her."

This might well have been construed not only as advising the execution of a will, but as said with the design of prejudicing decedent against her relatives. Again, Mrs. Roebuck testified that she once remarked, "Mrs. Salter, it was very nice of you to go over and take care of Mrs. Gracely," to which the latter responded, "If there hadn't been something in it for me, I never would have come." This answer may have referred to the mere matter of compensation agreed upon, or, in view of the liberal remembrance in the will, to what she expected from other sources, and was for the jury's consideration. The threat of Ritz to keep decedent's brother from the premises by writ of injunction, with Mrs. Salter and decedent standing by without objection, and his services on the several occasions in preparing, if not assisting in procuring, the several instruments, were proper for the jury to consider on the issue of undue influence. In connection with these matters, the condition of decedent's mind is to be considered; also the inequalities of the will, as later discussed, the obligations or lack thereof of decedent to Mrs. Salter, their former relations, the rapidity with which Mrs. Salter acquired con-

trol of decedent's property, the manner of accomplishing this, the care of her person, and the execution of the will with large devise to Mrs. Salter. No little difficulty would be experienced in explaining the course of events on any rational theory other than that Mrs. Salter exercised a dominant influence over decedent from the first. That a

2. WILLS: validity: undue influence: fiduciary relations.

fiduciary relation existed between testatrix and the beneficiary did not raise a presumption of undue influence. A statement to the contrary found in *Cash v. Dennis,* 159 Iowa 18, is inaccurate, and may be withdrawn from the opinion without changing the result. Something more is essential to justify that opinion, such as participation in fixing the terms of or drawing the will, and the bestowal therein of something more than a mere remembrance. *Graham v. Courtright,* 180 Iowa 394.

But the relationship of the parties is appropriate for consideration, and that Mrs. Salter had control of decedent's person and property, and that she was in feeble health, with mind impaired, indicated that she was peculiarly susceptible to such influences as might have produced the various instruments mentioned. She was paying for what she received, and as the record is without reasonable explanation of her generosity toward Mrs. Salter and her children, their relationship was a strong circumstance against the voluntary execution of the will. We are of opinion that the evidence as a whole was such as to have justified the submission of the issue of undue influence to the jury.

3. WILLS: testamentary capacity: evidence: nonexpert opinion: trivial facts.

II. We next inquire whether there was enough evidence of mental unsoundness to warrant the submission of that issue to the jury. The fact that she turned her business matters over to Mrs. Salter less than a month after her husband's death is indicative of distrust of her

own competency. The terms of the will also were to bo taken into account in connection with other evidence. Her brother, Arnold Liddle, had lost a leg, and was compelled to earn his living, and yet he was given only an insurance policy of $2,000, payable in installments, of which the record contains no other particulars. Her only sister was remembered to the extent of a third of the residue of the estate, which would be less than the value of the home-stead devised to Mrs. Salter, a stranger in blood. That she had a tender affection for this sister and brother ·was established beyond question.

Counsel for appellants argue that it was but natural that she should have remembered Mrs. Salter thus liberal-ly. Mrs. Salter was being adequately compensated for care and board, and it does not appear that anything else was owing her. Though they had been acquainted for some time, no special intimacy appears to have existed between them. Nor does any reason appear of record why she should have forgotten her own nephew and bestowed gifts on Mrs. Salter's children. The evidence tended to show that the decedent was an epileptic and was afflicted with hysteria. Dr. Porterfield testified to having called during Gracely's lifetime to rent the premises where decedent and her husband lived, and that he went again to measure the rooms for carpets; that decedent started to show him the house, when she began to cry, and said she had lived there for a long time and did not want to be turned out of her house; that thereupon he withdrew; that afterwards, Gracely told him his wife was reconciled, and he called a third time, and when he began measuring the rooms, she had "an emotional spell," and he decided not to disturb her peace of mind; that "she was a rather slender woman, medium size," and "seemed to have a shrinking, backward disposition, extremely nervous, impressionable. She gave me the general impression that she was the sort of woman

without much force, mental force of character," that, "when she had her emotional spell, she wrung her hands and seemed to take the position that I was one of the prime movers in a plot to take her house out from under her. * * * I made up my mind that Mrs. Gracely was a very pronounced hysteric. * * * A person suffering from hysteria is easily influenced and likely to act upon suggestion." The doctors, with the information possessed, declined to express an opinion as to whether she was of sound mind. Several witnesses described the spells or fits of decedent and testified that she had suffered from them many years. The doctors agreed that, while hysteria is a disease of the nerves, epilepsy is a disease of the brain, and being afflicted with either did not necessarily indicate inability to transact business. But these facts were proper

4. WILLS: testamentary capacity: nonexpert opinions: detail of facts.

to be taken into account by the jury in connection with the evidence of many witnesses who recited incidents and expressed the opinion that she was not of sound mind. Most of the witnesses had been acquainted with decedent for many years, and in this respect differed from those called by the defendant, a few of whom only had enjoyed a long or intimate acquaintance with her. Mr. and Mrs. Roebuck had resided across the street from the Gracelys for 23 years and had seen her practically every day. Mrs. Breynan had known her 33 years, and frequently visited her, and was employed frequently in the home during the last 14 years of decedent's life. Mrs. Digman had known her for 30 years, residing near and visiting her frequently. Mrs. Schenk had known her over 20 years. Miss Gale had met her 20 years prior to her death and had been intimately acquainted with her during the 5 or 6 years prior to the fall of 1913, having a room in her home and assisting and caring for her when not away engaged in nursing. Mrs. Marsh had worked for her 4 months, from about the 1st of October,

1913. These and others were shown to have known her intimately, and, after having recited incidents somewhat out of the ordinary, expressed the opinion that she was of unsound mind. Counsel for appellants contend, however, that the incidents related were of a trivial character, attributable to her afflictions and disabilities, and not such as warranted the opinions given. As a basis for these opinions, there was evidence tending to show that decedent in early life had been engaged in the millinery business and had possessed some business ability; that she had been a good housekeeper, and was interested in her personal appearance and manner of dressing; that, as the years went by, she suffered with epileptic fits; that she became slovenly in her dress; that, after these spells or fits, she would be weaker, and sometimes her mind would be inactive for several days; that she was afflicted with rheumatism so that she could not well dress herself or comb her hair, being unable to lift her hand up to her head; that she was somewhat deaf, and that her vision had become defective so that she couldn't see far; that she would stand out in the yard gazing all around as if looking for something; would wipe her hand over her eyes as if to brush something away; that she was found eating potatoes in the dark in her kitchen, and said in explanation that she did not have a light because she wanted to save the expense to her heirs; that she lay out in the damp grass one morning, it having rained the night before, and, when spoken to, said she was happy because of having such good tenants in her flat; that she would frequently pull the buggy out of the barn and sometimes into the yard and wash it, though it was clean; that she would get angry and go out and try to spade the garden or rake the yard; that she would undertake to chase children away, at one time attempting to pull up a section of the cement walk to throw at them; would become violently angry, and at one time attempted

to strike her husband with a chair, and at another threw a knife across the table at him; would wander about the house at night during a storm, and follow her husband for fear he would be struck by lightning and be killed, for that she wanted to be killed at the same time; that she would throw pillows on the floor and then pick them up and pat them so as to make them soft; that she couldn't carry on a connected conversation; that her eyes had a vacant look, and that she couldn't remember well; had an employee sing her to sleep and sit by her couch while she slept; that she would take a bowl of gravy from the table and eat it without anything else; would have crying spells and refuse to tell what she was crying about; was very forgetful in the matter of cooking; would insist upon her husband's letting her have money although she did not need it, and then would hide it in different places, as in the cupboard, under a rug, in the closet, in bed, in old shoes, and would then forget what she had done with it and have another help her find the different sums; that she would turn water on in the bath room and forget about it until it overflowed; that she doubled her fists and threatened to smash an employee's face; that she insisted that a certain picture was before her on the wall when it was not; and that she became angry at a neighbor and threatened to whip her with a horse whip; and possibly some other similar incidents. Some of these items are trivial, and others are explained so as to be consistent with rational conduct, if the explanation were accepted. Other incidents were so out of the ordinary as to indicate an unbalanced mind. She lived in a narrow sphere. The things she dealt with were not of much general importance. She was, and for years had been, in feeble health. Though the incidents related may have appeared trivial to some, the small things made up her life, and these, though trivial relatively, in the course of such a life may well be regarded as of enough significance to have fur-

nished basis for the opinions expressed. It is not neces-
sary to pick out those which are unusual or out of the or-
dinary. Enough were recited to warrant taking the opin-
ions.

It may be that, standing alone, the opinions in con-
nection with the recitals would hardly carry the case to
the jury, but, when considered in connection with her act
in turning all her property over to the management of
Mrs. Salter within a month after the death of her hus-
band, and a month and a half later renting her home to
the same person, and arranging for her care and board
with her for one year and later for five years, and another
month later executing the will with the provisions as
stated, and all this when but 56 years old, we are inclined
to think a case was made out for the jury. It is exceed-
ingly difficult to ascertain with any degree of certainty
the condition of the human mind at a specified time, and
we are not called upon to do so. All required is that we
say whether there was such a showing as to carry the issue
of mental soundness to the jury, and, having done so, it is
unnecessary to review the evidence adduced by proponents
or express our view as to the merits of the case.

III. The appeal was not perfected
5. APPEAL AND    within six months after the entry of judg-
ERROR: assign-
ment of error:   ment, but within that time from the entry
sufficiency.
                 of the order overruling the motion for new
trial. Several of the rulings challenged by assignments of
error are not touched in the motion for new trial, save gen-
erally, as: "The court erred in admitting certain evidence
offered by contestants and objected to by proponents as
shown by the official reporter's notes" and "in refusing to
admit certain evidence offered by proponents and objected
to by contestants as shown by the official reporter's notes."
Neither of these grounds challenged any particular rul-
ing, and the trial court was not required to search the rec-

ord and examine every ruling coming within the classification made. If such generality is to be indulged, the motion might as well be because of errors in all rulings on the trial. The particular ruling complained of should be pointed out as nearly as may be, and when rulings are grouped and objections made to all in a bunch as here, they are to be ignored as not constituting an "error of law occurring at the trial." See Par. 8, Sec. 3755, Code. As the trial court could not well have reviewed the recited rulings, included in the grounds of the motion for new trial, we may not do so on appeal. *Mueller Lumber Co. v. McCaffrey*, 141 Iowa 730; *Powers v. Des Moines City R. Co.*, 143 Iowa 430.

IV. Many of the objections to testimony adduced were on the ground that it was of declarations by devisee, Mrs. Salter, and decisions are relied on, such as *James v. Fairall*, 154 Iowa 252; *Lawless v. Lawless*, 156 Iowa 184; *Fothergill v. Fothergill*, 129 Iowa 93; *In re Ames' Will*, 51 Iowa 596. But these are not controlling, and the objections were rightly overruled, for the reason that such testimony was of what happened in presence of the testatrix, bearing more or less on the relations between the party alleged to have exercised undue influence and the testatrix. How better or more directly establish the fact alleged? If Mrs. Salter did anything for or said anything in the presence of decedent prior to the execution of the will or shortly thereafter, tending to show her dominance over decedent, or to persuade decedent with reference to the disposition of her property, surely evidence thereof was admissible as bearing directly on the issue of undue influence, and not merely of declarations or admissions of a devisee. Counsel for appellants assert that the presence or absence of decedent is immaterial, and it may be conceded that the exertion of undue influence

6. WILLS: validity: undue influence: evidence: acts and statements by one of several devisees.

may and sometimes does occur when the perpetrator and the victim are widely separated. This is not necessarily so, and ordinarily they are in personal touch, and direct proof of what the former does or says to or in the presence of the latter is received as evidence bearing directly on the issue.

V. Arnold Liddle, brother of decedent, after testifying that he visited decedent after her husband's death, that he met Mrs. Salter and Ritz, the attorney who subsequently prepared the will, there, was asked this question, "Without relating any transaction between yourself and your sister, tell what was said either by Mrs. Salter or Mr. Ritz or yourself." This was objected to as incompetent under Section 4604 of the Code, it not appearing that the witness did not participate in the conversation, and as calling for declaration on the part of one legatee or devisee not binding on the other beneficiaries of the will. The objection was overruled, and the witness answered:

7. WITNESSES: competency: transaction with deceased: showing of non-participation by witness.

"When I went into the house, Ritz was standing beside my sister, and Mrs. Salter was standing close by, too, and he says to my sister, 'Mrs. Gracely, we will take care of you, and if they do not keep away from here and from bothering you, I will serve an injunction against him. I guess that will keep him away.' Mr. Ritz said that to Mrs. Gracely. Mr. Ritz was standing close to her, patting her on the back. I think that was in June."

Conceding that the objection might well have been sustained because of there having been no showing that the witness had not participated in the conversation, the answer disclosed that all said was to the testatrix by one not a beneficiary under the will. It appearing that the witness did not participate, this portion of the objection was obviated by the answer. The ruling, then, was without prej-

udice. As Ritz was addressing testatrix, he could not well have been speaking for her, unless impliedly, for the edification of her brother. If so, then the evidence tended to prove her feeling toward him so short a time after the execution of the will that it was admissible. Other rulings either are covered by what has been said or were such as that they could not have influenced the result.

VI. J. S. Leeper, in the forepart of February, 1914, took decedent's acknowledgment, and heard her discuss an affidavit with Ritz, being present 10 or 15 minutes, and on April 17th following, he and Dr.

8. APPEAL AND ERROR: harmless error: improper exclusion of evidence: subsequent reception.

Allen were called by Ritz to witness the will. He related what happened on each visit, and, in response to an interrogatory, expressed the opinion that she was of sound mind.

"Q. What would you say as to her being capable of transacting ordinary business and intelligently disposing of her property on April 17, 1914? A. I think she was capable of transacting ordinary business and of disposing of her property as she saw fit."

This answer was stricken as incompetent and immaterial. This was error. *Glass v. Glass,* 127 Iowa 646; *State v. McGruder,* 125 Iowa 741. But the ruling could not have been prejudicial, for on cross-examination he testified that "there was absolutely nothing at the time the will was signed to lead one to suspicion that there was anything at all wrong with Mrs. Gracely. * * * I have all the evidence I need to have a fixed and positive opinion that she was of perfectly sound mind at that time. She seemed to be keen and bright and about the same as anybody of that age would be." Surely, this covered the answer stricken, and no disadvantage could have resulted from the erroneous ruling.

VII. The second instruction finds ap-

9. WILLS: valid-
ity: undue in-
fluence: instruc-
tions: confus-
ing, controlling
and non-con-
trolling ele-
ments.

proval in *Barry v. Walker,* 152 Iowa 154, and cases cited. Another may be set out. The court instructed that:

"Upon the question whether the instrument which purports to be the will of Sarah C. Gracely was obtained or procured through undue influence exerted upon her by Maude E. Salter, you are further instructed that, if a testator is of impaired mind and memory, then, although he may not have legally been incompetent to make a will, yet a will made by such a person ought not to be sustained unless it appears that the disposition of his property has been fairly made, and to have emanated from a free will of the testator, without the interposition of others, and according to the intentions previously expressed or implied from family relations. In this case, if you find from the evidence that the mind and memory of Mrs. Gracely was impaired, then, although you may find that she had sufficient mental capacity legally to make a will, yet, if you find that a disposition of her property has been made, by the instrument which purports to be her will, that is unfair to her legal representatives, and that such disposition did not emanate from a free will of the testatrix, and that it is not in accord with her previous intentions, either express or implied, from family relations, you will be justified in finding that such instrument is not the voluntary and free will of the testatrix, and that it was obtained by undue influence."

A somewhat similar instruction was approved in *In Re Will of Ames,* 51 Iowa 596, condemned in *Webber v. Sullivan,* 58 Iowa 260, and said not to have been erroneous in *Cash v. Dennis,* 159 Iowa 18.

It is confusing and difficult of analysis and not consistent with an accurate statement of the law applicable. No one will pretend that evidence of impairment of intel-

lect is not admissible as bearing on the issue of undue influence, for an impaired intellect is ordinarily more susceptible to influences exerted thereon than a normal one. The will may be valid even though the disposition of the property be unfairly made, or with the interposition of others, or not in accord with previously expressed or implied intentions of the testator. These matters or their converse may be shown, for they have more or less bearing on the issue of undue influence, but seldom, if ever, are essential to a finding either way on that issue. If the jury's attention is to be directed to these matters, let them be enumerated, and the jury told to take into consideration the conditions of the will, whether equitable or otherwise, the condition of testator's intellect, whether impaired or otherwise, any evidence bearing on the intentions of the testator previously entertained, and from these considerations, in connection with all other evidence, to say whether the testament was the product of undue influence, as defined, or the voluntary act of the testator. In other words, it is preferable that the ultimate issue be not confused or incumbered by the exaction of unnecessary findings in connection therewith. The instruction is disapproved, and should not be given in any case. True, it was copied in substance from a case holding that it was not open to the criticism then made, but that was not saying that it was without defect. It is not safe to instruct in the language of opinions nor to adopt instructions appearing therein, for opinions are written with reference to particular exceptions to rulings and instructions, and approved only with reference to the exception urged.

In view of the fact of there having been affirmative answers to two special interrogatories, finding testatrix to have been of unsound mind, as well as that the will was the product of undue influence, we are of the opinion that there was no prejudice.

10. APPEAL AND ERROR: harmless error: wills: misleading instruction: affirmative finding on issues: effect.

This is put on the ground, however, that there was suffi-
cient evidence to carry both issues to the jury, as there
was. See *In re Estate of Betts,* 113 Iowa 111; *In re Es-
tate of Selleck,* 125 Iowa 678; *In re Estate of Wiltsey,* 135
Iowa 430; *In re Van Houten,* 147 Iowa 729. Though,
where the evidence has been held insufficient to support one
of the special affirmative findings of undue influence and
mental incapacity, some of the above decisions seem to re-
gard the submission of such issue as without prejudice. It
is much to be preferred, however, that an issue unsupported
by sufficient evidence be withdrawn, as is exacted in other
cases, and a finding be not exacted thereon. The point,
however, is not involved in this case, as there was sufficient
evidence to carry both issues to the jury, and we are con-
tent in declaring that there was no prejudice.

IX. Through oversight, special inter-
rogatories asked by contestants were not
submitted to counsel before the commence-
ment of argument to the jury. These were
not given, but others, in different phrase-
ology, but in substance the same, were submitted to the
jury. These and the answers of the jury were:

11. TRIAL: ver-
dict: special in-
terrogatories:
non-submission
to counsel: ef-
fect.

"Did Sarah C. Gracely possess testamentary capacity,
on the 17th day of April, 1914, and at the time she exe-
cuted the instrument which purports to be her last will?
A. No. Q. Was the devise of what is known as the Grace-
ly home on East First Street, in Waterloo, Iowa, to Maude
E. Salter, procured by undue influence exerted by the said
Maude E. Salter upon the mind of Sarah C. Gracely, at the
time of the execution of the instrument which purports
to be the will of the said Sarah C. Gracely? A. Yes."

Assignments of error are predicated on the failure to
submit to opposite counsel before argument. The inter-
rogatories submit the two issues in the case. Independent
of any request, they were such as the court might well have

submitted without suggestion from either side, and as the court so did, it was not necessary to exhibit them to counsel. *Clark v. Ralls,* 71 Iowa 189; *Briggs v. McEwen,* 77 Iowa 303, 305; *Miles v. Schrunk,* 139 Iowa 563. See Code Section 3727. That other similar interrogatories were requested can make no difference, for they were not submitted. That those submitted to the jury were suggested by the ones requested cannot obviate the rule, unless, at least, prejudice appears. There, could not have been any here, for the two issues, either one of which, if established, would control the verdict, were submitted. The order of court denying the probate of the will is—*Affirmed.*

Gaynor, C. J., Evans and Salinger, JJ., concur.