IN RE WILL OF CLAUS JAHN.

HENRY N. JAHN, Appellant, v. EMILIE JAHN MACMURTRY, Appellee.

**WILLS:** Testamentary Capacity—Jury Question. Evidence pro and
1  con on the issue of the testamentary capacity of an aged testator
reviewed, and held to present a jury question.

**WILLS:** Requisites and Validity—Jury Question in re Undue Influ-
2  ence. Evidence pro and con on the issue of undue influence re-
viewed, and held to present a jury question.

**APPEAL AND ERROR:** Harmless Error—Submission of Issues In-
3  validating Will. An affirmative finding by the jury of both (1)
want of testamentary capacity and (2) undue influence effaces any
prejudicial error in submitting both issues when there is no testi-
mony to support *one* of the issues. Necessarily there can be no
suggestion of error in submitting both of said issues when they
both have support in the evidence.

**TRIAL:** Instructions—Inadvertent Use of Terms. The inadvertent
4  use in instructions of the term "defendant," when "testator" was
manifestly intended, does not constitute prejudicial error.

**TRIAL:** Instructions—Suggesting Force of Circumstance. An in-
5  struction which characterizes a certain circumstance as "suspi-
cious" will not be condemned as prejudicial when other parts of the
instruction guarded the jury against any possible misunderstand-
ing as to the weight and effect of said circumstance.

**COSTS:** Taxation in re Will Contest. An executor may not complain
6  of the taxation to him personally of the costs consequent on his
unsuccessful attempt to probate the will, when his efforts were in
his own personal behalf, as one of the principal beneficiaries of the
will.

*Appeal from Crawford District Court.*—E. G. ALBERT, Judge.

OCTOBER 17, 1922.

REHEARING DENIED JANUARY 20, 1923.

APPEAL from a judgment denying a will to probate. The
facts are stated in the opinion.—*Affirmed.*

*Sims & Kuehnle,* for appellant.

*L. H. Salinger* and *Conner & Powers,* for appellee.

STEVENS, C. J.—I. This is a contest over the admission to probate of the last will and testament of Claus Jahn. The will was offered for probate by Henry N. Jahn, a son of the testa-

1. WILLS: testamentary capacity: jury question.

tor's, who was named as executor in the will. Objections to the admission of the will to probate were filed by Emilie Jahn MacMurtry, the only living daughter of the testator. The objections filed allege testamentary incapacity and undue influence alleged to have been practiced upon the testator by Henry N. and William L. Jahn, his sons, and the principal beneficiaries of the will. Both issues were submitted to the jury, and found in favor of the contestant. The proponent, Henry N. Jahn, appeals. The insufficiency of the evidence to justify the submission of the issues to the jury, and certain alleged errors in the court's charge, constitute the propositions relied upon by appellant for reversal.

The will was executed December 12, 1914; and, after giving $500 to the contestant and some city lots to Henry N. Jahn, gives the residue of the estate, share and share alike, to him and his brother. The testator was 80 years of age at the time the will was executed. Claus Jahn, when a young man, came to the United States from Germany, where he was born, and, after living in different places in Iowa, settled on a farm in Crawford County in 1869, where he resided until 1894, when he moved to Manilla, Iowa. He was married before going to Crawford County, but his wife died about 1890. His family consisted of two sons, the daughter named above, and an older daughter, Anna, who died June 14, 1913, at his home in Manilla.

Mr. Jahn appears to have been prosperous, as he acquired 400 acres of land, and owned a residence in Manilla. The record does not show what, if any, other property was owned by him. After the death of testator's wife, Will Jahn and contestant operated the home farm, each keeping one third of the profits earned, and paying one third of the profits to the father. Henry and Anna lived on and operated another farm owned by testator, about a mile and a half from the home place, under a

like arrangement with the father. After the removal of the family to Manilla, the brothers engaged in the stock and grain business, the sisters joining, under an arrangement to share profits equally with the brothers. Will and Henry married a few years later, when the business arrangement between them and their sisters was dissolved. Contestant, except during short intervals, when absent on a vacation or for the health of herself and her sister, resided with her father until November 23, 1914.

The following dates and events are given much significance by counsel in argument, and we set them out at this time for convenience. Contestant and her sister Anna left Manilla on June 5, 1912, going to Colorado and California, ostensibly for their health, returning October 25th following. They again left Manilla on December 17, 1912, returning to Crawford County, but going to Denison, February 6 or 7, 1913, where they remained at a residence where they secured rooms, until March 29, 1913, when they returned to their father's home at Manilla. As stated, Anna died June 14, 1913. On November 25, 1914, contestant was married to a former pastor, by the name of A. J. MacMurtry. On December 21, 1912, testator conveyed 160 acres of land to each of his sons.

The evidence on the issue of the testator's testamentary capacity on behalf of the contestant, briefly summarized, was, in substance, as follows: Testator was enfeebled with age; was afflicted with senile dementia; frequently had dizzy or fainting spells, during which he became unconscious for intervals of from a few minutes to, on one occasion, more than an hour; became untidy and forgetful; would frequently fall over backwards in the yard; upon one occasion became unconscious at the dinner table; would go to a cave on the premises in the night, where, on one occasion, he was sought and found by contestant in an unconscious condition. Testimony on her behalf shows that she called her brother and a doctor to assist her to care for him; that he would let the fire go out in his room until it became cold, or would not adjust the drafts so as to prevent the room from becoming overheated; that he so far lost control of his urine and bowels that it was necessary to place rubber sheeting upon his bed; that he frequently went to bed with all his clothes on, including his shoes; that he would urinate in the

daytime in the dooryard, and, upon one occasion, urinated in the presence of his niece, who was a young lady; that in the summer time, he would put on his overcoat, overshoes, overalls, and winter cap, to go down town; that several times, when he met a neighbor whom he knew, and whose husband he knew to be dead, he would inquire of her .about her husband; that he asked neighbors who had never been in Germany if they remembered his old friends in that country, and would talk to them in German, although he knew that they could not understand him, notwithstanding the fact that he could speak English; that he would repeatedly drive the chickens into the chicken house in the afternoon and shut them up; that, when playing cards, he would forget the trump; that he would get up in the night and strike matches and wander about his room; that he frequently went to the cave; and that he would bundle all his clothing up, put it in a sack, and set it at the foot of his bed at night, and, in the morning, would return it to its proper place.

The foregoing and other incidents of lesser importance constitute the direct evidence on behalf of contestant, bearing upon the issue of the alleged testamentary incapacity of testator. Most of the above facts were testified to by contestant. She was, however, corroborated by other witnesses as to several of them, and in other material respects.

Many witnesses were called by proponent who testified that they had known the testator for many years, and had never observed him manifest any symptoms of mental unsoundness or infirmity, except such as are commonly incident to old age. Direct testimony as to the ability of testator to transact business is confined almost entirely to the leasing of his farms, and small transactions such as the purchase of household necessities, and going to the post office for the mail. A banker with whom testator had done business for many years testified that he prepared leases for testator's farms, and transacted other business with him, and that he never noticed that he was forgetful or incapacitated to do business; and gave it as his opinion that testator was of sound mind. Other witnesses testified to the same effect. Medical experts, testifying in answer to hypothetical questions, expressed the opinion that he was of unsound

mind.   Other experts called by proponent gave testimony to the contrary.

There is no direct evidence that the execution of the will was the result of undue influence practiced upon the testator by his sons.    The contestant, however, relies upon numerous incidents,. some of which are more or less re-

2. WILLS: requi-
sites and valid-
ity: jury ques-
tion *in re* undue
influence.

mote, to sustain this issue.    The Jahn family, except the father, were members of the Presby- terian Church at Manilla.    A. J. MacMurtry, at one time pastor of this church, left Manilla in 1905, and later became a lecturer.    There appears to have been occasional cor- respondence between MacMurtry and different members of the Jahn family.

While contestant and her sister Anna were in Los Angeles on their first trip in 1912, they learned that the latter had a cancer in her breast.   Contestant wrote to MacMurtry, who was living at Oakland, California, informing him of the serious character of Anna's illness, and asking for advice.   MacMurtry answered the letter, saying that he would soon be in Los Angeles, on business; and he did, shortly thereafter, visit the sisters at that place.   He advised them to consult a physician whom he named, at Omaha.   An arrangement was then or later made, as the result of which the sisters met MacMurtry at San Francisco, and came with him to Omaha, where the doctor was consulted, and an operation performed upon Anna.   On the second trip west, in December, 1912, the sisters were accompanied by Mac- Murtry from Omaha, who went to Cañon City, and they to Pueblo, to visit some friends.   Unable to locate their friends, they also went to Cañon City, where they remained for some weeks.   During part or all of the time they were in Cañon City, they and MacMurtry lived in a rooming house, ate their meals together, and shared the expense of the meals equally.   They occupied separate apartments, however.   When the sisters re- turned to Crawford County, going to Denison in February, 1913, they were accompanied by MacMurtry.

Some time prior to August 28, 1913, MacMurtry com- menced a suit against his wife at Oakland, California, for a divorce.   An interlocutory decree, upon the cross-petition of the wife, was entered in the divorce action on the above date,

and a final decree November 23, 1914, two days before contest-
ant and MacMurtry were married, in Omaha. The sisters loaned
MacMurtry $3,000 with which to pay alimony to his wife. Al-
though he gave them a note for the amount, it has not been paid.
An attorney by the name of Moore, who resided in Manilla,
went to Oakland, California, in December, 1912, where he met
and had a conference with Mrs. MacMurtry's attorney in the
divorce suit. Moore told the attorney what he knew of the
associations of MacMurtry with the Jahn girls, and sought to
effect an arrangement for Mrs. MacMurtry to file a cross-peti-
tion and ask for separate maintenance, instead of a divorce.
This, it is claimed, was to prevent a divorce and the possible
subsequent marriage of contestant and MacMurtry. In this,
Moore was unsuccessful. He also suggested the commencement
of an action by Mrs. MacMurtry against the Jahn girls for dam-
ages for the alienation of her husband's affections. Upon the
return of the Jahn girls to Crawford County, in February, 1913,
Moore wired the attorney at Oakland for permission to secure
attorneys at Denison to institute an action for that purpose
against them. Permission was granted, and action commenced;
but the case was settled for $1,000, and dismissed July 14, 1914.
Moore testified that he was employed by the testator to go to
California and secure such information as he could as to the
conduct of the Jahn girls and their relations with MacMurtry,
and that neither Will nor Henry Jahn employed or paid him
for his services, or had anything to do with his going. The
brothers testified to the same effect. The record discloses, how-
ever, that they took some part in the alienation suit, and that,
when Moore went to California, Henry Jahn wrote a letter, at
Moore's request, to the chief of police at Cañon City, asking
that he keep his eye on MacMurtry and his sisters, and inform-
ing him that Moore had left for Berkeley to see the former's
wife and help her fight the divorce suit. He also said that, when
the chief of police was through, he would pay him for his work.
A postscript stated that Moore was his attorney, and that the
letter was written at his request. Henry admitted writing the
letter, but denied that Moore was employed by him, and testified
that he did not know for what purpose or at whose request he
went to California.

On January 13, 1913, following the execution of the deeds conveying 160 acres of land to each of the brothers on December 21, 1912, Henry wrote and mailed a long letter to his sisters, signed by their father. He testified that he wrote it at his father's dictation and request. The subject-matter of the letter was the alleged misconduct and association of the girls with MacMurtry. Reference is made to the $3,000 loan, and to the shame and disgrace that must follow their relations with him; and the letter urged them to have nothing further to do with him.

R. M. Jones, called by contestant, testified that he was formerly city editor of the Omaha World Herald, and that, some time in 1913, Moore, accompanied by Will and Henry Jahn, came to his office, gave him a history of the Jahn family and the alleged relations of Emilie and Anna with MacMurtry, and requested the publication of an article in relation thereto. The witness, at that time, declined to publish anything. Later, charges were filed with the proper authority at Omaha against MacMurtry, asking that he be expelled from membership in the presbytery. These charges appear to have been filed in the name or on behalf of Claus Jahn. After a second visit to the newspaper office, an article announcing that charges had been filed against MacMurtry, and reflecting upon the relations of the Jahn girls with him, was published. There is no other testimony that the testator knew about it, or had anything to do with the charges that were filed against MacMurtry.

Another circumstance should be noted in this connection. A letter in the handwriting of contestant, addressed to "Dear A," and signed "Sue," was found by Mrs. Henry Jahn on the dining table in the father's home, after the daughters went away in December, 1912. It is tacitly conceded that the letter was intended for MacMurtry; and, while couched in somewhat guarded language, it discloses the writer's affection for him, as well as her intention to marry him when the decree in the divorce action was made final.

It was stipulated by the parties that the land conveyed to the sons was of the market value of $175 per acre, and that the 80-acre tract owned by testator at the time of his death was worth $140 per acre, and the home in Manilla $1,500. Emilie

and Anna jointly owned 200 acres, of the stipulated value of $175 per acre. This land was acquired by them independently. Anna devised her share in this land to Emilie. Will Jahn also. owned 320 acres of land in South Dakota, worth $80 per acre.

Moore testified that he wrote the will from a memorandum given him in his office by the testator. The subscribing witnesses testified that it was signed by the testator in their presence at the home of Henry Jahn about 8 o'clock in the evening; that testator looked at the will, apparently reading it. Moore was also present when it was signed. It will be observed that the deeds to the sons were executed four or five days after the daughters left home in December, 1912, and after the so-called "Dear A" letter was discovered and given to the father by Henry, and that the will was executed about three weeks after Emilie and MacMurtry were married. A notice, signed by testator, demanding that the contestant and her husband keep away from his house and not enter his premises, was served upon contestant immediately upon her return from Omaha after the marriage. By mutual arrangement, however, contestant was permitted to personally remove her effects from the house; but she never thereafter saw her father. The notice appears to have been given to a constable by Henry Jahn, and served at his request. There is some conflict in the testimony of the constable, upon this and a former trial, as to the part taken by the testator in that transaction. Upon the former trial, the constable testified that the testator said he "didn't want the old devil in the house,"—evidently referring to MacMurtry; but upon this trial, he testified that he had had no conversation with Claus Jahn.

At the close of contestant's evidence, and again after both parties had rested, proponent moved the court for a directed verdict, upon the ground that the evidence was wholly insufficient to justify the submission to the jury of either the issue of testamentary incapacity or of undue influence. The motion was overruled; and, as stated above, both issues were submitted, and found by the jury in favor of contestant. Appellant contends with much earnestness and vigor that the motion for a directed verdict should have been sustained, and our attention

is called to many of our prior decisions, to sustain this contention.

The case made by contestant is, obviously, not a strong one, but the weight of the evidence and the credibility of the witnesses were for the jury. While, as stated, the deeds conveying 160 acres to each of the sons were executed shortly after the discovery of the "Dear A" letter, and the will about three weeks after the marriage of Emilie to MacMurtry, the effect of these facts upon the mind of the father is not shown by direct evidence. Whether he was influenced thereby to voluntarily execute these instruments by his disapproval of his daughter's claimed misconduct, or whether the letter and her marriage to MacMurtry were used by the sons as a means of alienating the father's affection, and to induce him to convey the land to them and to execute the will making them the principal beneficiaries, is wholly a matter of inference. Of course, the validity of the deeds is not involved in this controversy; but the execution thereof is a part of the transactions of the sons with their father, and proper to be considered in this case. One witness testified that, when testator was first shown the deeds in Henry's office, he refused to sign them, and later said that he regretted having done so, and that the boys made him do it. Contestant testified that, during the several months she lived at home after she returned from California in February, 1913, her father was kind and affectionate toward both herself and her sister. The evidence shows that he paid Anna's funeral expenses. He appears to have depended much upon his daughters to care for him and his home prior to Emilie's marriage, and her relations with MacMurtry are not shown to have ever been the subject of conversation between them. There is nothing in the record more directly showing immoral relations between Emilie or her sister and MacMurtry than the fact that they occupied separate apartments and ate their meals together in a rooming house at Cañon City, and a telegram from a Presbyterian minister at that place that MacMurtry introduced the girls as his cousins. This is denied by contestant. Emilie testified that neither she nor her sister at any time had immoral relations with MacMurtry.

As stated, the evidence relied upon to establish testator's mental incapacity is not conclusive, but evidence to that effect

is not wholly wanting. Some of the circumstances disclosed do unmistakably indicate mental weakness. The medical experts called by contestant, in answer to hypothetical questions, gave it as their opinion that the testator was of unsound mind. The probative value of expert testimony is minimized by counsel for appellant. That it is more or less unsatisfactory in cases of this character may be conceded. Just what degree of mental impairment disqualifies one from making a valid will is admittedly difficult of scientific or judicial determination. Much has been written upon the subject, and we shall not undertake to add anything to what has been repeatedly said in prior decisions of this court. Attention is called to the following: *Meeker v. Meeker,* 74 Iowa 352; *In re Will of Richardson,* 190 Iowa 586; *Byrne v. Byrne,* 186 Iowa 345; *Bales v. Bales,* 164 Iowa 257; *In re Will of Kester,* 183 Iowa 1336. Even if we should find that the evidence was insufficient to justify the submission of the issue of undue influence to the jury, its submission, under our prior decisions, was without prejudice. *In re Will of Van Houten,* 147 Iowa 729. It is, however, our opinion that this issue was properly submitted to the jury.

We have set out the evidence of contestant on both of these issues at considerable length. We shall not undertake to review it further, or to demonstrate the sufficiency thereof to carry the issue of testamentary capacity to the jury. We think it was sufficient for that purpose.

II.   It is next insisted by appellant that it was error for the court to submit both the charge of testamentary incapacity and of undue influence to the jury, for the reason that they are inconsistent, and that a finding of testamentary incapacity necessarily excluded the existence of undue influence. Whatever may be the holdings of the courts in other jurisdictions on this question, it has been decided by this court adversely to appellant's contention. *In re Will of Van Houten,* supra; *Liddle v. Salter,* 180 Iowa 840. Notwithstanding the holding of the above cases that the submission of both issues, although but one is sustained by the evidence, is without prejudice, it would doubtless always be better to withdraw from the jury the issue that is without

3. APPEAL AND ERROR: harmless error: submission of issues invalidating will.

support in the evidence, as in other cases.  *Liddle v. Salter,* supra.

III.  Complaint is also made of the 5th, 10th, 11th, 12th, 13th, and 18th paragraphs of the court's charge to the jury. The exceptions to most of these instructions are based upon the thought that the issues of undue influence and testamentary incapacity are inconsistent, and that both should not have been submitted to the jury.  Some of them are slightly lacking in clearness, and, standing alone, might be subject to criticism; but when read in connection with the charge as a whole, they are reasonably full and complete, and could not have been misunderstood by the jury.

In the 10th paragraph, the court used the word "defendant" for "testator."  That the reference was to the latter is so obvious that no confusion could have been caused by the error.  It is unnecessary to set out these instructions or review them at length, as the exceptions urged are without substantial merit.

4. TRIAL: instructions: inadvertent use of terms.

IV.  Complaint is also made of the 19th instruction.  The court in this instruction stated that one of the contentions of appellee was that, at the time the will was drawn and signed, W. S. Moore, the lawyer who prepared it, was in the employ of Henry N. and Will L. Jahn, beneficiaries, and advised the jury that, if it was shown by a preponderance of the evidence that such relation did exist at that time, the will must be treated the same as though it had been drawn by the beneficiaries themselves.  The foregoing was followed by the statement that "this circumstance does not invalidate the will nor even create any presumption against its validity, but, if proven, is a suspicious circumstance which you may take into consideration, together with all the other facts and circumstances in the case, in determining whether or not any undue influence was practiced upon the testator in connection with the making of the will."  It would have been better if the words "is a suspicious circumstance" had not been used; but we said in *Graham v. Courtright,* 180 Iowa 394, at 408, that the insertion by the draftsman of a will of a legacy in his own favor is a suspicious circumstance, entitled to more or less weight, according to the facts of the case.  The

5. TRIAL: instructions: suggesting force of circumstance.

only evidence bearing directly upon the question as to who employed the scrivener to draw the will of Claus Jahn is that of the attorney Moore, who testified that the testator came to his office, gave him the facts from which he prepared a memorandum, and requested that a will be prepared for his signature. The question as to what extent, if at all, Moore was the attorney for Henry Jahn was one of the disputed questions of fact.

The exceptions preserved to this instruction go only to the use of the words "suspicious circumstance." The instruction was, however, so framed as to guard against any possible misunderstanding by the jury of the weight and effect to be given to this circumstance. The jury was plainly told that it did not even create a presumption against the validity of the will, and should be taken into consideration only in connection with all the other facts and circumstances of the case, in determining whether or not the will was the result of undue influence. We think that the instruction, even if erroneous in the particular complained of, was without prejudice.

V. The costs in the court below were taxed to the proponent. He complains of the taxation of the costs to him, insisting that, as the designated executor of the will, it was his

6. COSTS: taxation *in re* will contest.

duty to present it for probate. Except for a bequest of $500 to the contestant, proponent and his brother were the sole legatees named in the will. The effort to secure the admission of the will to probate was largely a matter of personal interest. In view of our previous decisions, we do not believe that the court abused its discretion in directing the clerk to tax the costs to the proponent. *Allen v. Seaward,* 86 Iowa 718; *In re Estate of Burgin,* 191 Iowa 898; *In re Estate of McClellan,* 192 Iowa 384.

While some of the questions discussed by appellant have not been given separate consideration, they have not been overlooked in reaching our conclusion. We do not deem them of controlling importance.

We find no reversible error in the record, and the judgment of the court below is, accordingly,—*Affirmed.*

EVANS, ARTHUR, and FAVILLE, JJ., concur.