IN RE ESTATE OF ALBERT W. ENSMINGER.

ALTA C. CARLSON, Proponent, Appellant, v. J. B. VAN HORN, Guardian, Contestant, Appellee.

No. 45453.

MARCH 18, 1941.

Arthur O. Leff and Lane & Waterman, for appellant.

Byington & Rate and Messer, Hamilton & Cahill, for appellee.

SAGER, J.—The case before us presents the usual aspects of a will contest. The record is long and the exhibits numerous. As is to be expected, the witnesses differ widely. Some pictured the testator as a capable, self-reliant, self-sufficient businessman fully competent to manage his affairs, and impervious always to importunity or any other external influence.

On the other hand, he was said to be suffering from senile dementia at the time the will was made, advanced arteriosclerosis affecting heart and brain, progressively growing worse. There was testimony that he was filthy in habit, going to bed with all his dirty clothes on (except possibly his shoes), and that he was dominated by and domineered over by proponent who acquired all his large estate to the exclusion of two minor grandchildren, his only other heirs. This contest is somewhat unusual in that there is no estate to be passed by the testament under investigation.

It is manifestly impossible as it is unnecessary to set out the evidence at length. We have held:

"We are bound by the finding of the jury, who are triers of fact, if there is evidence supporting and sustaining their finding upon the ultimate question of testamentary capacity. Where reasonable minds, searching for the truth, might reasonably differ upon the record made as to what the ultimate fact is about which there is controversy, it is, and always must, be, a question for the jury. Where the record presents a state of facts from which an ultimate conclusion must be drawn, and reasonable minds might differ as to what conclusion should be drawn from the ultimate facts proven, it then becomes a jury question." Philpott v. Jones, 164 Iowa 730, 734, 146 N. W. 859, 860.

Appellant cites these cases but none requires a result dif-

ferent than that herein announced: Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55; In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301; In re Estate of Paczoch, 202 Iowa 849, 211 N. W. 500; In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792; In re Will of Diver, 214 Iowa 497, 240 N. W. 622; Worth v. Pierson, 208 Iowa 353, 223 N. W. 752; In re Will of Shields, 208 Iowa 607, 224 N. W. 69; Wolfe v. Shroyer, 206 Iowa 1021, 221 N. W. 546; Hann v. Hann, 202 Iowa 807, 211 N. W. 495; In re Will of Johnson, 201 Iowa 687, 207 N. W. 748; In re Estate of Fitzgerald, 219 Iowa 988, 259 N. W. 455; In re Will of Muhr, 218 Iowa 867, 256 N. W. 305; In re Estate of Mott, 200 Iowa 948, 205 N. W. 770; Green v. Ellsworth, 221 Iowa 1098, 267 N. W. 714.

We quoted with approval in Mileham v. Montagne, 148 Iowa 476, 486, 125 N. W. 664, 668, from Judge Cooley in People v. Garbutt, 17 Mich. 9, 16, 97 Am. Dec. 162, 164, as follows:

" 'Mental disease is itself so various in character, so vague, sometimes, in its manifestations, and so deceptive, especially in its early stages, and its causes are so subtle and so difficult to trace, that the most experienced experts are sometimes obliged to confess that, however careful and thorough their investigations, they still prove unsatisfactory, leaving the mind not only in a condition of painful uncertainty upon the principal question whether mental disease actually exists, but when its actual presence is demonstrated, failing utterly, in many cases, to trace it to any sufficient cause.' "

In Brogan v. Lynch, 204 Iowa 260, 264, 214 N. W. 514, 516, Justice De Graff, speaking for this court, said:

"The question of undue influence, in a case of this kind, cannot be separated from the question of testamentary capacity; and conduct which might be held insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. See Monahan v. Roderick, 183 Iowa 1; In re Will of Overpeck, 144 Iowa 400; In re Will of Wiltsey, 135 Iowa 430."

With these preliminary observations we turn our attention

to the record. Appellant concedes that "if either issue should have gone to the jury the error in submitting the other if found, would be without prejudice and would not require a reversal."

Since the question before the court was whether the evidence was sufficient to support the verdict we set forth a part of the record upon which we think a jury might well have found the verdict they did. The evidence is not entirely clear on the matter but testator was in the neighborhood of 70 years old when the will was executed. Those who knew him for many years said that he was physically frail. Notwithstanding he acquired a large amount of property, consisting of 515 acres of land in Johnson county and more than $20,000 in bonds. Whether there was anything else, proponent got it all by deed and other transfers. An attorney who prepared most, if not all the papers executed by Ensminger, was a witness for the proponent, but the jury might have found that while he claimed to be acting as attorney for the testator, only, he was really working in the interest of the proponent, Alta C. Carlson. We offer no opinion as to what the fact in that regard really was. On every occasion when a transfer of property was made to Alta she was present, as she was when any other business was transacted. While the evidence furnishes no direct proof that she exercised undue influence at any particular moment, the record is not wanting in proof of circumstances which might warrant the jury in finding that she had and exercised such influence in acquiring, without any consideration, all the property he had. We do not overlook the claim being made that a contract for support executed by proponent and her father was in compliance with an oral contract made when she acquired the deed to the 515 acres of land. The jury might have disbelieved this when it reflected that proponent's attorney testified that she was not present and took no part in the deed transaction.

In the language of Eglin, a banker who had dealings with the testator, "Alta was always with him and they usually had their minds made up before they came up there, practically." Other witnesses said that she took an active and vigorous part in the leasing of land, and in attempts by attachment to collect the rents. Her attitude was one of continual disparagement, in the presence of testator, of her brother and wife, par-

ents of the wards of contestant. This attitude followed Arthur to the grave. In the case of the wife it went to the extent of saying that she was suffering from a "bad disease". She asserted that Arthur had spent forty-odd thousand dollars of his father's money although there is no proof worthy of the name to establish it.

On one occasion in 1924 after the brother had sold some stock, the proponent in the presence of her father said that from that time forward she was taking charge of the testator's property. The father begged her to be still and not to make so much trouble, appeared nervous, excited and broke into tears. This mental agitation over the actions of the proponent was manifested on a number of occasions. The extent to which Alta went in dealing with her father appears from her own testimony in an incident related by her as follows: "I remember talking about a fly swatter but there was no threatening of suicide. He had an old one, he wanted a better one, I told him he couldn't have it. I said I don't think you should kill dirty flies, why do you want to monkey with the dirty flies, they carry dirt. We had a few arguments, I finally told him he could have it, gave him two or three."

She had access to the father's bank box and declared she had things fixed so Arthur and his family would get none of the testator's property. She ordered her father around and not infrequently used vile language towards him. On one occasion she grabbed money out of his hand and flung it into the face of Kennard who had made a down payment on land that Kennard was buying. She declared that that deal could wait until the following Monday. Kennard testified: "On a couple occasions we were arguing about a deal he just told me to keep still she was boss he had to do what she said. He would say just keep still Joey let her have her own way, you can't outtalk her, she is boss, I have to do what she says."

Incident after incident might be pointed out showing the dominating way in which proponent dealt with her father. It scarcely needs to be said that witnesses for her testified that they observed none of these instances to which reference has been made, but proponent herself does not deny them. On the contrary, she seems to have made an effort to escape testifying at all ad-

vising her attorney shortly before the trial she might go to Arizona and in fact went to Chicago.

As we said in the Brogan case, supra, the question of undue influence in a case of this kind cannot be separated from the question of testamentary capacity. See also in Iowa re Estate of Cooper, 200 Iowa 1180, 206 N. W. 95; Lingle v. Lingle, 121 Iowa 133, 96 N. W. 708.

If the evidence of proponent's influence be thought insufficient to overcome the will of a man mentally sound, there is evidence in the record from which the jury could have found that the testator was not that.

Dr. Fitzpatrick, a qualified physician and surgeon, was called to the home of testator on May 25, 27, June 1 and June 4, 1934 (the will was made on May 4, 1937), to treat a child of Mrs. Carlson. He observed the testator who he said was very much senile and dominated by his daughter. He was childish and did not know what he was doing. This witness was called to see testator on January 25, 1935. Ensminger was in bed with his clothes on. He then had a marked sclerosis of the blood vessels, was vague in comprehension and slow to answer; he was suffering from marked general arteriosclerosis of the blood vessels in the brain with retarded mental processes. This sclerosis would devitalize his system including his kidneys and central nervous system. Testator was then of unsound mind. His condition would not improve either mentally or physically but was permanent and would become progressively worse. Proponent argues however that this witness admitted on cross-examination that if thereafter the testator transacted business in a normal manner his diagnosis was wrong. The weakness of this argument lies in the fact that the jury could find that he did not transact business normally thereafter.

Dr. Love of Iowa City, a qualified physician and medical member of commissioners of insanity of Johnson county, gave a detailed account of arteriosclerosis and its effects. From this the jury could have found that Dr. Fitzpatrick was right. And as a matter of undisputed fact the death certificate filed by Dr. Rankin who attended Ensminger in his last sickness in July 1939 stated the cause of death to be lobar pneumonia complicated by cardio-renal decompensation.

This opinion is already too long to permit an extended statement of the medical testimony but it was all before the jury and from it they may well have reached the conclusion that the testator was not only mentally unsound but, because of that condition, peculiarly susceptible to the influence of his aggressive daughter.

We are not unmindful of a tendency to minimize the value of expert testimony in cases of this kind. Our views were aptly stated by Stevens, C. J., in In re Will of Jahn, 195 Iowa 74, 83, 189 N. W. 974, 977: "Just what degree of mental impairment disqualifies one from making a valid will is admittedly difficult of scientific or judicial determination. Much has been written upon the subject, and we shall not undertake to add anything to what has been repeatedly said in prior decisions of this court." And it was the conclusion of this court then as it is in the case before us that it was properly a case for the jury. Finding no error in the court's refusal to direct a verdict for the proponent, its judgment is affirmed.—Affirmed.

HALE, C. J., and WENNERSTRUM, GARFIELD, MILLER, OLIVER, BLISS, and STIGER, JJ., concur.