BERTHA W. HANSEN, Appellant; v. ERICK N. WAUGH et al., Appellees.

No. 46790.

MARCH 5, 1946.

Herrick, Sloan & Langdon, of Des Moines, for appellant.

C. A. Smedal and C. G. Lee, both of Ames, and Paul W. Steward, of Des Moines, for appellees.

OLIVER, J.— This is a will contest, involving a purported will and codicil of Rikka Waugh.

Rikka Waugh was born in Norway in 1852 and died in Des Moines in 1943, aged ninety-one years and five months. She came to this country as a young woman. Her father bought her one hundred twenty acres of land in Hamilton County, Iowa, near Roland, a town fifty miles north of Des Moines. She married Nels Waugh and they lived on said farm until 1903, when they moved to Roland. Their four adult children were Erick, Nellie (Josendal), Bertha (Hansen), and Frederic. Bertha Hansen lived in Des Moines. Nellie Josendal lived in Roland, and Erick and Frederic on farms near Roland.

Although Rikka Waugh was educated there is evidence that she said she never had been interested in business affairs, that she knew little about business matters, and that her husband had handled her farm and all the family business, including even her personal shopping, with which the daughter Nellie assisted. The rents from her farm went into her husband's accounts. Apparently Rikka never had a bank account.

From his farming operations Nels Waugh accumulated a substantial estate, consisting of four Iowa farms totaling five hundred eighty acres, one hundred sixty acres in South Dakota, the home and several vacant lots in Roland, and certain mortgages and other personal property.

For the last few years of his life Nels Waugh was in failing health and John Josendal, husband of Nellie, managed the farms and business affairs, without charge, and Nellie and John did Rikka's shopping. Nellie, Mrs. Erick Waugh, and Mrs. Frederic Waugh also assisted Rikka with her household duties and some of them were in Rikka's home each day.

In 1936 Nels Waugh suffered a paralytic stroke. Rikka suggested a guardianship. Upon Nels' application John Josendal was appointed guardian of his property. During part of his illness Erick and Frederic, and Frederic's son, Robert, alternated in caring for him at night.

Nels Waugh died intestate in October 1937. Upon petition of Rikka Waugh and Nellie Josendal, Erick Waugh and John Josendal were appointed administrators of his estate. Bertha and her husband, Fritz Hansen, wanted Fritz appointed, but Rikka thought that inadvisable because of his lack of familiarity with the matters and his inconvenient location.

Shortly thereafter Rikka said she was not capable of handling her own affairs, that her husband had always done that, and that she wanted John to do it because he had helped her all the years her husband had been sick. John told her he did not like to act alone and she said it would be all right to have Erick act as guardian with him. Thereupon Rikka Waugh petitioned for the appointment of Erick and John

as guardians for her property, stating therein that by reason of her age and certain infirmities, both physical and mental, and the disabilities arising therefrom, she did not feel herself able and competent to manage her affairs and look after her property rights in order to preserve the same for herself and family. Letters of guardianship were issued December 27, 1937.

Rikka Waugh was then a frail little woman of eighty-five, weighing about eighty-five pounds. She was nearly blind and was unable to read. Her blindness and feebleness apparently limited her writing to scrawling her name. Some of her signatures indicate that she was unable to see where she was signing. Although she was very feeble and nervous and exhibited some loss of memory, she was a fine, bright old lady of deep religious convictions, loving and beloved by her children, grandchildren, and others who knew her. Her relations with her children and grandchildren were intimate.

Rikka continued to live in Roland for a few months after her husband's death. About March 1938 she went to the home of her daughter and son-in-law, Bertha and Fritz Hansen, in Des Moines, for a short visit. She remained there until her death in 1943.

May 20, 1939, she executed the purported will, leaving $300 to each of her three surviving children, Erick, Nellie, and Bertha (Rikka's son Frederic had died in 1937); $500 to each of three grandchildren; $300 to each of five grandchildren; and $1,000 to her church. Following these legacies the will gives Bertha the one-hundred-twenty-acre farm and the entire remainder of the estate and nominates Bertha as executor.

July 25, 1941, she executed a codicil, paragraph 1 of which recites the death of her daughter, Nellie Josendal, and gives the $300 devised to Nellie in the original will to the widow of Rikka's son Frederic.

Paragraph 2 cancels all indebtedness of Bertha and Fritz Hansen and directs that such cancellation shall not diminish the share that Bertha may be entitled to receive under the will and codicil.

Paragraph 3 states:

"A few weeks after the death of my husband, Nelse E. Waugh, on October 25, 1937, my signature was fraudulently obtained to a petition for guardianship, and other papers, by my son, Erick Waugh, and son-in-law, John Josendal, and their attorney * * * solely for their own selfish interests, and all without my knowledge and consent. That my estate has been greatly diminished by litigation arising out of this guardianship, and the failure of the guardians to protect my interests in the estate of my husband and to protect my interests in my own property. The guardians having failed and also refused to keep me informed as to my income and expenditures of my estate, I now have no definite knowledge of the amount of my estate.

"That because of this fraud practiced upon me, I do not know whether there will be sufficient cash left in my estate to pay the legacies set out in my Last Will and Testament. Therefore, I am now reducing the legacy of One Thousand ($1,000.00) Dollars, to the Salem Lutheran Church at Roland, Iowa, as set out in Paragraph Four (4) of my Last Will and Testament, to Five Hundred ($500.00) Dollars."

Paragraph 4 provides for the forfeiture of the interest of any beneficiary who contests the will or attempts to have it construed or interpreted by a court. This paragraph further provides that it shall not be deemed to prevent Bertha from instituting any suit or proceedings for the construction or interpretation of the will.

The trial court fixed the value of Rikka's estate, at that time, at approximately $35,000. Under the will and codicil Bertha was to receive more than $30,000; Bertha's son $500; and all other members of Rikka's family only $3,100.

Bertha Hansen offered the will and codicil for probate. The heirs contested on the ground that the execution of said instruments was procured by the exercise of undue influence upon Rikka Waugh by the proponent, Bertha Hansen, and her husband, Fritz Hansen. Trial to a jury resulted in a verdict for contestants. From the judgment thereon denying the probate of said instruments, proponent, Bertha Hansen, appeals.

There was substantial evidence, some of which is disputed, as follows:

After Rikka Waugh went to live with the Hansens in 1938 she was under their close supervision practically all of the time. She went only such places as they took her. Her means of communicating with others by writing was limited to signing her name to papers placed before her by the Hansens. She talked with only such people as came to the Hansen home. Bertha Hansen was a trained nurse and gave her complete care, the care of an invalid. She was quite dependent upon Bertha Hansen and had complete confidence in her. The guardians had no opportunity of talking with her alone. When they attempted to talk to her on business matters one of the Hansens answered for her.

Various lawyers appeared for Rikka in the guardianship and estate proceedings. Rikka never was in the office of any of these lawyers, never talked with them except at the Hansen home, and never communicated with them at their offices except through the Hansens. Rikka Waugh never attended any of the court hearings incident to the various proceedings instituted for Rikka or for Bertha and Rikka. Nor was her deposition ever taken in any of said matters.

Upon one occasion, when the Hansens brought Rikka to Roland to get some of her household goods, Erick Waugh and one of Rikka's grandchildren helped load the Hansen's automobile. The Hansen car was overcrowded and Erick's wife asked Rikka to ride in their car. Bertha Hansen refused to permit Rikka to ride with Erick and his wife.

Nellie Josendal died from cancer June 30, 1941. Shortly before Nellie's death the Hansens had promised to bring Rikka to see her. They did not appear at the appointed time and Nels Nessa, a nephew of Rikka, and Inger Nessa, his sister, and Erick went to the Hansen home. The Hansens and Rikka were absent but returned later. They had been visiting a sick friend of the Hansens for three hours. Although John Josendal had told Rikka that Nellie was dying from cancer and wanted to see Rikka, and Rikka had expressed a desire to see Nellie, Bertha Hansen, who was a trained nurse, had led Rikka to believe the illness was not

serious and had told Rikka that she (Rikka) could not go because she was too old. Then Fritz Hansen said, in the presence of Rikka, "Well, she can't go. * * * All they want up there is to have her sign some papers," and he called John Josendal and Erick Waugh "skunks and crooks." Rikka became very nervous. A second effort by Nels Nessa to get Rikka to see Nellie a short time later also was blocked by the Hansens. Rikka was not permitted to see her dying daughter. Nor did she or the Hansens attend the funeral.

Nor were any of the relatives at Roland notified of Rikka's final critical illness until after her death. She died at one p. m., December 27, 1943, and the will and codicil were filed for probate within an hour or two.

The attorney for Rikka's guardians and for the administrators of Nels' estate had represented Nels Waugh for many years and had continued to represent Rikka. Early in 1938, before Rikka left Roland, she said the Hansens told her they had looked at the papers filed (in the courthouse) at Nevada and that one of those papers, signed by Rikka, gave this attorney $15,000. Rikka was greatly disturbed until the attorney secured the paper, which was merely the petition for the appointment of administrators, and explained to Rikka that he had not appropriated money from the estate.

At about that time Rikka said she would like to give some money to the church. It was suggested she could do so by will. She said, "No, I don't want to make any will, because I want to treat them all alike."

While Rikka was living with the Hansens, John or Erick would occasionally call upon her. John Josendal testified that most of the time the Hansens did not talk to him, just sat in the corner, except when he talked to Rikka and then they answered. Fritz Hansen also suggested that Josendal could just as well stay away. One time when Josendal was talking with Rikka, Fritz Hansen said, "Mrs. Waugh wants you to step out as guardian because she will be able to see now, she can take care of her own affairs." Mrs. Waugh did not say anything.

After John or Erick departed the Hansens would usually

discuss the guardianship with Rikka and say they could not understand why the guardians would not give it up and let Rikka take care of it herself because she was able to do so and that the guardians were taking all the money.

Upon a later occasion Erick asked Rikka who was caring for the South Dakota farm. Rikka said she should not say anything, Bertha would answer for her; she was old, she could not remember.

Prior to the execution of the will the Hansens told Rikka that John Josendal and Erick Waugh would take all of her money away from her and she would not have anything left. Statements of this nature were made to Rikka almost every day. The Hansens frequently told her that John and Erick were not looking after her property; that they were going to take all of her money; that there would not be anything left; that John and Erick would rob her. Upon one occasion when Fritz and Bertha were talking to Rikka, Fritz Hansen told Rikka he would like to have her make a will and leave everything to Bertha. Rikka said she did not want some (of the family) to have more (than the others), that she wanted them all treated fairly. Fritz then said if Rikka would make a will in favor of Bertha, Bertha would divide the estate evenly among the rest of the family, but that if she did not make a will, John and Erick would take all of it and Bertha would be left out entirely. Upon occasions when the matter of the disposition of Rikka's property was thus discussed she would become very nervous and wring her hands.

There was evidence that at first Rikka did not believe the statements that her guardians were neglecting and looting her estate. She would say she could not believe they would do that and was satisfied to have them continue to serve as guardians of her property. After she became convinced they were taking her money she was greatly concerned and wanted the guardianship terminated.

The record shows that nearly all of the guardians' checks made payable and addressed to Rikka were endorsed and cashed by Fritz or Bertha Hansen. On many of them Rikka Waugh's name was endorsed in the handwriting of Fritz or

Bertha. In May 1940 the Hansens opened a checking account
of their own in a Des Moines bank. From then until August
1942, each $100 per month allowance check made to Rikka
was endorsed by one of the Hansens and deposited in their
bank account. There is evidence from which it could properly
be inferred that Rikka did not know how much the guard-
ians were paying Rikka at that time.

July 9, 1938, Fritz Hansen secured an attorney for Rikka.
This lawyer had several conferences with Fritz and Bertha
at his office, examined the court files in the guardianship and
estate matters, and prepared a petition for the termination
of Rikka's guardianship, which prayed, in the alternative,
that Bertha Hansen be appointed guardian in place of John
and Erick. September 26, 1938, he went to the Hansen home,
was introduced to Rikka, discussed her affairs with her, read
to her the petition for termination of guardianship and a
petition for an order of court authorizing her to employ
counsel. Rikka signed said petitions. An amended and sub-
stituted petition, which prayed only the termination of the
guardianship and set up additional grounds therefor, was
later prepared and on November 10, 1938, the attorney took
it to the Hansen home and read or explained it to Rikka.
The attorney had another conference with Rikka at Hansens'
April 25, 1939. At various other times the Hansens con-
ferred with him at his office.

At the conferences with Rikka the attorney was asked
the effect of the guardianship upon her right to dispose of
her property by deed or will. He advised that any important
papers executed by her while under guardianship, though
not necessarily invalid, might be questioned and that she
should first have the guardianship terminated or an examina-
tion by one or two physicians who could testify to her mental
condition, or take both such steps.

The trial of the action to terminate the guardianship
would require Rikka's testimony, either by deposition or
preferably in person in court at Nevada. On account of the
condition of her health the attorney sought to avoid this,
upon the theory that because the guardianship was voluntary

it was terminable at Rikka's demand, irrespective of her competency to manage her property affairs. That part of the case was submitted to the court in March 1939, and the court ruled against such contention.

On April 25th the attorney advised Rikka a trial could be had on the fact question whether she was able to handle her affairs or an appeal could be taken from the adverse order of the court. About the middle of May Fritz Hansen notified the attorney that Rikka no longer desired his services. For obvious reasons, the attorney wanted his discharge confirmed by Rikka. On May 19, 1939, he wrote Rikka enclosing a statement to that effect for her signature. May 25th Fritz returned the statement with Rikka's signature thereon. A blank for the date of her signature had been filled in by typewriter to read "May 13, 1939."

Later, upon order of court, the attorney was paid his fees out of the guardianship funds.

In the meantime, on about May 11, 1939, Fritz Hansen had gone to Webster City and retained another attorney. (Part of the land in the Nels Waugh estate was located in Hamilton county, and an action in partition could be maintained there.) This attorney checked the court records at Nevada, came to the Hansen home in Des Moines and there met Rikka. The Hansens were present. They discussed the interests of Rikka and Bertha in the Nels Waugh real estate and apparently decided it should be partitioned. They also discussed the question whether Rikka could make a valid will while under guardianship and the attorney said he wanted to check that point. He did so and again came to Des Moines May 18th, at which time he conferred with Rikka concerning her will and the disposition of her property to be made thereunder, and took notes from which he later prepared the will. Bertha Hansen was present at that time.

On May 20th he returned with the will and a petition to partition the real estate in the Nels Waugh estate. He was accompanied by a young man who served upon Rikka original notice of the partition suit. In that action Bertha was plaintiff and Rikka a defendant, although, from a practical standpoint, their interests were not hostile. (It may be here noted

that such an action had been started in Story county by the attorney for Nels Waugh's estate, but had been abandoned at Rikka's request that the property be not divided.)

Bertha Hansen had called in several lady friends to sign as witnesses to the will and another (who later prepared the codicil) to notarize Bertha's signature to the petition in partition. The assemblage gathered in the living room; one of the ladies read the will to Rikka; Rikka signed, the witnesses signed, the attorney took the will, and Bertha served refreshments.

The attorney made no charge to Rikka for preparing the will. He retained possession of it until March 1941, when the Hansens called at his office with a written order signed by Rikka and he delivered it to them. This attorney continued to represent Bertha in the partition suit and in the Nels Waugh estate and also represented Rikka and Bertha in certain proceedings in Rikka's guardianship.

The codicil was drawn by the lady attorney, a long-time friend of Bertha, who had appeared in the role of notary public at the signing of the will and first met Rikka on that occasion. She was attorney for Bertha at the time she drew the codicil. The records show that on May 14, 1941, she filed application for an order of court that, as attorney for Rikka and Bertha, she be notified of all applications for orders in the Nels Waugh estate, a like application in the Rikka Waugh guardianship, and a resistance to a certain application of the guardians then on file.

She testified she attended a party given by Mrs. Hansen on Rikka's eighty-ninth birthday, and that a few days later she called upon Rikka at the Hansen home and secured the information which enabled her to prepare the codicil. On the evening of July 25, 1941, she again called at the Hansen home and, in the presence of several other lady friends of Bertha Hansen, read the codicil to Rikka and it was executed by Rikka and witnessed by the visiting ladies. She made no charge to Rikka for preparing the codicil.

The record indicates that the charges made in paragraph 3 of the codicil, hereinbefore set out, that the guardians and their attorney had been guilty of fraudulent conduct or had

failed to protect Rikka's interests were groundless. The evidence was sufficient to have warranted the jury in concluding that such charges originated in statements and suggestions made by the Hansens to Rikka.

I. We are satisfied that under the record the question of undue influence was for the jury. There was substantial evidence that Rikka was a virtually blind and feeble old lady (she was almost eighty-seven when the will was made); that she had great trust and confidence in and dependence upon Bertha Hansen and that the Hansens dominated and controlled her to an extraordinary degree; that the Hansens systematically proceeded (in part by deceit and fraud) to alienate Rikka from other members of her family, who were, with Bertha, the natural objects of her bounty, and to destroy her love for and her trust and confidence in them; that the Hansens solicited the making of a will in Bertha's favor; that they procured an attorney to make the will and Bertha was present at the time its terms and provisions were fixed, and that Rikka had no independent legal advice in connection therewith. The record was sufficient to warrant a finding that the will made an inequitable and unnatural distribution of Rikka's property and that such disposition was contrary to her previously expressed intention and was the result of her will being overpowered by the undue influence wrongfully exercised upon her by the Hansens for that purpose.

The circumstances surrounding the execution of the codicil were similar to those under which the will had been executed two years previously. Although the codicil gave some further benefits to Bertha it did not greatly change the will. It marks the continuation of the conditions which existed at and prior to the execution of the will and furnishes additional evidence of Rikka Waugh's state of mind and what she believed to be true.

In Shaw v. Duro, 234 Iowa 778, 14 N. W. 2d 241, and In re Estate of Coe, 234 Iowa 1113, 15 N. W. 2d 278, we recently considered factual situations similar, in many respects, to those at bar, and held the question was for the jury. Among other decisions involving the question of the sufficiency of the evidence are, In re Estate of Eiker, 233 Iowa 315, 6 N. W.

2d 318; In re Estate of Brooks, 229 Iowa 485, 493, 294 N. W. 735; James v. Fairall, 154 Iowa 253, 134 N. W. 608, 38 L. R. A., N. S., 731; In re Will of Busick, 191 Iowa 524, 182 N. W. 815. In most of the foregoing cases the showing of undue influence was weaker than in the case at bar. No showing comparable to that in this case was made in any decision relied upon by appellant.

■ II. The third instruction to the jury states, in part:

"Although the issue of testamentary capacity has been withdrawn, yet there is left in the case evidence which has been introduced to show the mental condition of Rikka Waugh. You may consider such evidence as bearing upon her susceptibility to undue influence, if any, and her powers to resist the same."

There was evidence of Rikka's mental condition in the record and the instruction was proper. In re Estate of Eiker, 233 Iowa 315, 6 N. W. 2d 318. See, also, Shaw v. Duro, 234 Iowa 778, 783, 14 N. W. 2d 241.

■ III. Over objections to her competency under section 11257, Code of Iowa, 1939, the dead man statute, Betty Waugh Quam, a legatee under the will, was permitted to testify to conversations between the Hansens and Rikka. Appellant predicates error thereon. The record shows the witness took no part in the conversations. Hence she was competent.

■ Appellant complains also that this witness was permitted to state her conclusions as to these conversations. We do not so interpret the record. The witness testified to the "substance" of the discussions (conversations).

■ Appellant asserts also that testimony of certain statements and declarations of Bertha Hansen, not in the presence of Rikka, was erroneously admitted over the objections that the questions called for answers which might be prejudicial to the interests of other beneficiaries under the will. We are unable to agree with appellant's interpretation of the record that the statements were not made in Rikka's presence. We think the record, considered as a whole, shows Rikka was

present. Moreover, appellant's objections, made at the time the questions were put, support such interpretation. The testimony was substantive evidence of what took place between the Hansens and Rikka, rather than of declarations of Bertha Hansen, and was properly admitted. Liddle v. Salter, 180 Iowa 840, 853, 163 N. W. 447.

■ IV. Error is assigned to the overruling of objections relative to testimony, hereinbefore mentioned, that Rikka said the Hansens told her a paper signed by her in her husband's estate gave the attorney $15,000, and that she was greatly disturbed until the attorney made explanation to her. Such evidence was admissible, not as substantive proof of what the Hansens said but as tending to show the state of mind and conduct of Rikka. In re Estate of Hollis, 234 Iowa 761, 769, 12 N. W. 2d 576; In re Estate of Eiker, 233 Iowa 315, 6 N. W. 2d 318. Appellant complains that the court did not so limit the effect of this evidence. There is no showing such complaint was properly made in the trial court. Hence it will not be considered.

■ V. One of the lawyers who saw Rikka at the Hansens was asked if on a certain occasion he observed either of the Hansens undertaking to direct or tell her anything to do. He told what he observed. He was later asked if he ever saw or heard anything done or said by either of the Hansens that "indicated to your mind that in any way they were undertaking to or were controlling or influencing Mrs. Waugh in what she was doing." An objection to said question was sustained. This ruling was correct.

There is a rule that a conclusion may be admissible when the matter to which the testimony relates cannot be reproduced or described to the jury as it appeared to the witness. Shaw v. Duro, 234 Iowa 778, 790, 14 N. W. 2d 241. That rule is not here applicable. The witness could have been asked what he observed and, we may say, was well able to testify to the facts as distinguished from his conclusions.

Nor can we agree with the suggestion that the witness, being a lawyer, was an expert on undue influence or that opinion evidence upon that subject would be admissible. · As a practical proposition, one who plans to secure the execution

of a will or other instrument by undue influence would doubtless try to conceal the true situation from a reputable lawyer called to prepare such instrument.—Affirmed.

BLISS, C. J., and HALE, MILLER, WENNERSTRUM, SMITH, MANTZ, and MULRONEY, JJ., concur.

GARFIELD, J., takes no part.