In the Matter of the ESTATE of Ernest C. CORY, Deceased.

Melville V. CORY, Plaintiff-Appellee,

v.

ANKENY STATE BANK, Ankeny, Iowa, as Executor of the Last Will and Testament of Ernest C. Cory, Deceased, Edith Cory, Gladys Spring, Albert D. Cory, and All Unknown Claimants and All Persons Unknown Claiming any Right, Title or Interest, However Described in and to the Estate of Which the Said Ernest C. Cory Died Seized, Defendants,

Edith Cory, Gladys Spring and Albert D. Cory, Defendants-Appellants.

No. 53306.

Supreme Court of Iowa.

July 24, 1969.

Rehearing Denied Sept. 15, 1969.

Coppola & Trout, Des Moines, for appellants.

Smedal, Maurer & Brewer, Ames, Charles E. Feight, Ankeny, and Herrick, Langdon, Belin & Harris, Des Moines, for appellee.

MOORE, Justice.

This is a will contest case. The will being contested was dated January 18, 1965 and filed June 3, 1965 in the Polk County district court. It was admitted for probate on June 14, 1965. Contestant filed his petition to set aside probate and contest will on November 2, 1965.

Contestant alleged lack of testamentary capacity and undue influence as grounds for denying validity of the will. The court withdrew the issue of lack of testamentary capacity but submitted the issue of undue influence for jury determination. The jury returned a verdict for contestant and the

order admitting the will to probate was cancelled. Proponents appeal alleging error in overruling their motion for a directed verdict and various evidentiary and procedural errors. We affirm.

The record in this case, as is true with most will contests, is voluminous. We set forth only so much of the evidence as is necessary to a fair understanding of the issues.

The testator, Ernest C. Cory, was born March 16, 1881, died May 30, 1965 and had been married three times during his lifetime. He was married to Nellie Cory, in 1900 and divorced from her in 1917. The couple lived in Oklahoma and had two children, Albert Cory and Gladys Cory Spring, who are defendants-proponents in this action. The couple were divorced and both returned to Elkhart, Iowa. In 1921 Nellie and the two children moved to California and have lived there since. Nellie died in 1945.

In 1917 Ernest married Edna Cory and lived with her in Elkhart and later in Ankeny, Iowa until she died September 19, 1963. This couple had one child, Melville V. Cory, plaintiff-contestant in this action. Testator was in the hardware business for 46 years. He retired in 1945.

On November 7, 1965 Ernest married Edith Cory. She was his wife when he died and is a defendant-proponent in this action.

Although Albert and Gladys moved to California with their mother, they were in touch with their father from time to time. Albert visited his father in Iowa in 1925, 1945, 1949 and 1964. In 1949 Albert was in Iowa and drove his father to California for a visit. Albert lived with his father and Edna, the second wife, for a winter in 1917 or 1918. He also saw his father twice in Arizona and six times in California in 1927, 1937, 1945, 1947, 1952 and 1965. On this latter date his father executed the will in question.

Mrs. Spring testified she visited her father in Iowa four times through the years. Her last visit in Iowa was in 1948. Her father visited her in California some eight or nine times. On the last visit in 1965, Ernest and Edith stayed with Gladys seven days and with Albert ten days.

In 1956 testator made a will leaving all of his estate to his then wife, Edna, if she survived him. If Edna predeceased him, the will provided the entire estate was to go to his son Melville; if Melville predeceased the estate was left in trust for Melville's children, testator's grandchildren. While married to Edna testator helped his son Melville by giving him a home and setting him up in the hardware business in Ankeny, (testator's store, which he later gave to Melville, was in Elkhart).

Testator was very close to his wife Edna. After her death efforts were made by his son Melville to provide a housekeeper for testator but this effort failed.

Various witnesses testified that at about this time testator showed evidence of loss of memory, some confusion and lack of interest in and grasp of current events. Others testified he was perfectly normal. On July 9, 1964 testator signed a petition for a voluntary guardianship asking that his son, Melville, be appointed guardian. There was also reference to a trust agreement said to have been prepared after Ernest decided to remarry but before the marriage was performed. No such agreement was produced in evidence. An antenuptial agreement was prepared and signed by Ernest and Edith on November 3, 1964.

■ I. We turn first to proponents' motions for a directed verdict and review the evidence in the light most favorable to contestant, rule 344(f)2, Rules of Civil Procedure. Proponents' first assigned errors relate to failure to direct a verdict at the close of contestant's evidence and failure to direct a verdict at the close of all the evidence. We consider the assignments together. If the trial court was right in its ruling on the final motion it is immaterial

whether it was right in the first ruling. Smith v. Smith, 258 Iowa 557, 562, 139 N.W.2d 453, 457, and citations.

The jury could reasonably find from all of the evidence that after his second wife's death in 1963, Ernest Cory was a lonely man whose mental faculties were beginning to slip to some degree due to age and arteriosclerosis. There was evidence of loss of memory, some confusion and general deterioration.

Testator lived alone for a little over a year after Edna's death. He visited his son Melville frequently and also visited the neighbors. During the winter of 1963–64 he went to a motel vacation spot in Texas as had been his custom for the past fifteen years. The owner of the motel and her employee both testified they noticed a change in Ernest after his wife died. During this stay he became homesick and unhappy. The motel operator sent for Melville to come to Texas to take him home. Dr. Nord, testator's physician and a friend of Melville, also went to Texas. Dr. Nord testified at length as to his acquaintance with Ernest and Edna during earlier years, his observation of testator and to various specific incidents evidencing deterioration after Edna's death. He testified decedent had arteriosclerosis and died of coronary artery disease. He was asked to express opinions both as to Ernest's competency and susceptibility to influence. His answers were: "I think I previously stated that I thought his general demeanor was such that a progressive loss of his mental acuity over a period of several years and and I make no specific claim that in any designated length of time that he lost his competency. I think the efficiency of the mind gradually decreased. I think that will be all. * * *. In my opinion, Mr. Cory has been very susceptible to the influence of others no matter who was trying to influence him."

Testator and his third wife had entered into an antenuptial agreement three days before their marriage under which the spouses would make no claim on the other's property except that the wife would receive a flat $2500 from Ernest's estate if he died within a year plus $1000 for each year he lived and the parties stayed married up to a maximum of $5000. Edith Cory, Ernest's widow, contended this agreement was made at Melville's insistence.

Ernest and his new wife Edith went to California shortly after their marriage. While they were there Albert Cory contacted Mr. Mathon, a lawyer, and arranged for an interview for the purpose of making a will. Mr. Mathon testified at length and told of being contacted by a Mr. Bauch, an acquaintance of his who had been selling merchandise to Albert Cory's wife for many years. Mr. Mathon did not represent or know Albert or any of the Corys. When told the potential testator was an old man and the will might be contested, he arranged for an interview and evaluation by Dr. Brandt, a local psychologist. This resulted in an opinion that testator was competent. After the evaluation the lawyer interviewed Ernest in the presence of Edith, Albert and Josphine, Albert's wife. The relatives were asked to leave and the lawyer interviewed testator in private. Part of these interviews were taped.

Testator in his private taped talk with his lawyer clearly expressed a disinclination to make another will until he could go back to Iowa, find his other will and do something about a $10,000 note he had co-signed for Melville. At the interview testator did not order Mr. Mathon to draw the will, although he told the lawyer what he wanted in the will if one was to be drawn.

The lawyer several times impressed on Ernest the desirability of making a will immediately. We do not imply that Mr. Mathon went beyond the bounds of propriety. Nevertheless, the testator, after the strong recommendation of the lawyer, refused to order the will drawn. This 83-year-old man then went to Albert's home and the next day the will was ordered drawn. The record is silent as to who actually phoned the lawyer and told him to go ahead with the preparation of the will.

The lawyer prepared the will and forwarded it to Mr. Cory by special delivery letter. Execution took place in Albert Cory's home in the presence of Edith, Albert, his wife and other persons. Judith Stevens, step-daughter of Albert, acted as notary public. Three witnesses, all of whom either worked for Albert Cory's wife or were married to one of her employees, witnessed the will. The executed will was returned to the lawyer who kept it until notified of Ernest's death. After Ernest and Edith returned to Iowa no mention was made of the will.

Much could be quoted from the taped recording of the lawyer's interview which is beneficial to each side. We note only two quotations. At one point Ernest said: "Bert (Albert) brought up something here last night. He said, why don't you divide it four ways?" At another point in discussing the premarital troubles with Melville, resulting in the antenuptial agreement, Ernest and Mr. Mathon exchanged the following: "Cory: I think that's enough. Mathon: That's enough for her? Cory: All she asked for. Mathon: All right. Cory: That is only she don't ask for it. I mean that's what sh * * * Mathon: * * * All right, now. So that's the whole story. That's a very simple will if that is your desire."

Contestant states his position in the following manner: "Where decedent, 83, executed the will in California, 2000 miles from his home in Iowa, and the will was prepared by an attorney, whom he had never met, and who had been employed by decedent's wife of two months and his son by a former marriage with whom he had had no close contact for more than 47 years; and where the decedent is shown to have at least three times refused to authorize the preparation of the will; and the will was executed in the presence of witnesses who were employees of the son's wife, and notarized by the daughter of the son's wife; and the executed will was thereafter kept and retained by the lawyer in California, there was ample evidence to support the finding of the jury that the will was the result of undue influence."

Proponents' motion for a directed verdict at the close of all the evidence was successful as to the issue of incompetence but the issue of undue influence was submitted to the jury. The court was correct in both instances.

■ The applicable rules are conveniently gathered in In re Estate of Roberts, 258 Iowa 880, 888, 889, 140 N.W.2d 725, 730, as follows: "Undue influence must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the influence. It must operate at the very time the will is executed and must be the dominating factor. (Citations).

"The elements which must be present to justify submission of a case to a jury because of undue influence are: (1) the person be unquestionably subject to undue influence, (2) opportunity to exercise such influence and effect the wrongful purpose, (3) a disposition to influence unduly for the purpose of procuring an improper favor and (4) the result clearly appearing to be the effect of undue influence. (Citations).

"Direct proof is not required. Undue influence may be and usually is proven by circumstantial evidence. (Citations). The evidence, however, must disclose more than a scintilla to justify submission to the jury. (Citations).

\* \* \* \* \* \*

"On the issue of testamentary capacity the burden is upon contestants to show lack of mental capacity in one of these respects: (1) to understand the nature of the instrument he is executing, (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty and (4) to know the distribution he desires to make. If his mental capacity is not equal to any one of these tests he cannot make a valid will.

In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818; In re Estate of Springer, 252 Iowa 1220, 110 N.W.2d 380; Hart v. Lundby, 258 Iowa 46, 137 N.W.2d 642. And we have often said there must be substantial evidence of mental unsoundness in order to generate a jury question. Proof of mental deficiency must be applicable to the very time of making the will."

Within the above rules each case is largely determined by its own facts. Here we hold there was sufficient circumstantial evidence to generate a jury question. Undue influence is ordinarily not exercised in public view. It is only rarely that direct evidence of its operation is available. In re Estate of Ramsey, 252 Iowa 48, 51, 105 N.W.2d 657, 659; In re Will of Busick, 191 Iowa 524, 530, 182 N.W. 815, 818.

II. In re Estate of Telsrow, 237 Iowa 672, 677, 22 N.W.2d 792, 796, states: "The issue of undue influence in a will contest cannot be separated from that of testamentary capacity. Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. One who is infirm and mentally weak is more susceptible to influence than one who is not. In re Estate of Ensminger, 230 Iowa 80, 82, 296 N.W. 814, 815, and cases cited; 68 C.J. 767, § 438."

But this does not mean the issue of lack of competency to make a will must be submitted to the jury whenever undue influence is submitted. Cases in which the trial court withdrew the issue of competency but submitted undue influence are common. In re Will of Soderland, 239 Iowa 569, 575, 30 N.W.2d 128, 131; Hansen v. Waugh, 237 Iowa 304, 316, 21 N.W.2d 762, 768, and citations.

III. The first two divisions of this opinion dispose of several of proponents' thirty-eight assignments of error. This proliferation of assignments has made it difficult to treat the matters of real merit. We shall treat the remaining assignments in as orderly a manner as the record will permit.

Proponents complain of the trial court's action allowing a prior will and the antenuptial agreement to be pleaded and introduced in evidence. They contend the validity of the will in question should not be clouded with questions as to the validity of prior wills, citing In re Cocklin, 230 Iowa 415, 297 N.W. 864. Here the validity of neither the prior will nor of the antenuptial agreement was being questioned. The fact Mrs. Cory was not entitled to her statutory share of testator's estate, due to the antenuptial agreement, was relevant as it related to proponents' disposition to unduly influence testator. Similar distinctions are recognized in In re Estate of Kenny, 233 Iowa 600, 603, 10 N.W.2d 73, 75; Storbeck v. Fridley, 240 Iowa 879, 882, 38 N.W.2d 163, 165; Anno. 82 A.L.R. 963. The documents were properly admitted.

IV. Proponents further complain of the undue restriction on their cross-examination of Melville V. Cory in relation to the identification and introduction of the antenuptial agreement. We find no abuse in the trial court's ruling limiting the scope of cross-examination.

The pleadings admit execution of the antenuptial agreement by Ernest and Edith Cory prior to their marriage. As pointed out supra, its validity was not being questioned.

In sustaining contestant's objections that the questions propounded on cross-examination were not proper cross-examination, the trial court stated: "I believe his testimony only identified the signature." The record so discloses.

In Trachta v. Iowa State Highway Comm., 249 Iowa 374, 390, 86 N.W.2d 849, 859, we say: "Generally a party has no right to cross-examine a witness except as to facts and matters stated in direct examination. * * * We also recognize that considerable latitude must be given the trial court in determining what is relevant to the issue being considered."

Our holdings are numerous that the scope and extent of a cross-examination are largely within the trial court's discretion. Likewise, cross-examination must be limited to matters about which the witness has been examined on direct examination. Central Fibre Products Co. v. Lorenz, 246 Iowa 384, 390, 66 N.W.2d 30, 33; Hope v. Ted McGrevey, Inc., 241 Iowa 1022, 1025, 44 N.W.2d 369, 370; Pond v. Anderson, 241 Iowa 1038, 1045, 44 N.W.2d 372, 376; Connelly v. Nolte, 237 Iowa 114, 129, 21 N.W.2d 311, 318.

98 C.J.S. Witnesses § 393, page 166, states: "Under the generally prevailing rule, where a witness is called by one party as to some particular or formal point only, the adversary is not entitled to examine him generally."

58 Am.Jur., Witnesses, section 637, page 353, states: "Under the American rule, a witness called merely to identify letters, statements, or other instruments may not be cross-examined regarding other matters in issue in the cause."

Assuming arguendo the trial court had some discretion as to the scope of cross-examination of the witness, Melville V. Cory, we find no basis for holding that discretion was abused.

The record discloses nothing improper or prejudicial in the trial court's rulings during cross-examination of Melville V. Cory.

V. Proponents also complain of undue restriction of cross-examination of other witnesses, including proponent Edith Cory. We will not extend this opinion by detailed analysis of these complaints. We observe the court has considerably more discretion in this area because the witness was available to the cross-examiner as a friendly witness. The importance of the order of proof in this area is examined in McCormick on Evidence, sections 23 and 29.

VI. By bill of exceptions, supported by affidavits, proponents showed three matters pertaining to jury conduct that they claim constituted prejudicial error. The first matter concerns one of the jurors talking to two witnesses in the corridor just outside the courtroom door. This was observed by proponents' attorneys who in turn discussed the incident with contestant's attorneys. Proponents' attorneys chose to make no record thereof until after the verdict and then by a bill of exceptions which made no claim any part of the case had been mentioned. Counter affidavits clearly show the conversation was limited to what rates one of the witnesses and husband were charging in the operation of their motel in Donna, Texas.

Assuming arguendo proponents made timely record of the juror's improper conduct in talking to the two witnesses, it is our conclusion the facts disclosed do not justify our holding the refusal of a new trial by the trial court was an abuse of discretion necessitating the granting of a new trial.

In Dakovich v. City of Des Moines, 241 Iowa 703, 712, 42 N.W.2d 511, 516, we quote with approval this from Foedisch v. Chicago & N. W. Ry. Co., 100 Iowa 728, 731, 69 N.W. 1055, 1056: "A verdict will not be set aside merely because a juror has, in violation of his sworn duty, talked to persons about the case. It must appear that the misconduct was such as to materially affect the substantial right of the complaining party. (Citing cases.)" Here the case was not mentioned in the conversation.

In State v. Dudley, 147 Iowa 645, 126 N.W. 812, we held the fact one of the jurors spoke to the prosecutrix during the trial of a rape case, simply passing the time of day, was not prejudicial to defendant.

To similar effect see McNider v. Fisher, 197 Iowa 523, 526, 527, 197 N.W. 647, 649; State v. Foster, 136 Iowa 527, 532, 114 N.W. 36, 38; State v. Olds, 106 Iowa 110, 119, 76 N.W. 644, 647.

■ The second complaint concerns the court's action in allowing the jury to be separated overnight after the case had been finally submitted to it. This court has severely criticized the trial court whenever the jury has been kept in continuous session unduly late at night, or even in some cases throughout the entire night. Kracht v. Hoeppner, 258 Iowa 912, 140 N.W.2d 913. Customarily, 9th judicial district judges have resorted to the practice of allowing the jurors to return to their homes. In this case the court informed counsel of the custom in civil cases to allow the jury to deliberate until 9:00 p. m. and then allow them to return to their homes overnight and reconvene in the morning. There was no formal objection.

Since this case was tried Iowa Rule of Civil Procedure 199(b) has been amended, effective July 4, 1967, Laws of the 62d General Assembly, chapter 475, rule 199(b), page 869. Trial courts now have authority in civil cases to allow the separation of the jury overnight, on weekends, holidays or in emergencies.

■ VII. The third charge of jury misconduct as asserted in the bill of exceptions is that one of the jurors (subsequently named foreman) during the trial procured dictionary definitions of the words "undue" and "undue influence" and brought them into the jury room during deliberation where they were read.

The first sentence of the article "Misconduct of Jury Members in Iowa", 10 Drake Law Review 126, is: "In the process of reaching a verdict, jury members may do many strange and unconventional things." Experience dictates agreement with this observation. A review of cases from other jurisdictions shows a desire by jurors to investigate the dictionary meaning of commonly used words is not unusual.

■ We have often considered the question of whether a new trial should be granted because of misconduct of jurors. In order to justify a new trial on the basis of misconduct of jurors it must appear the misconduct was calculated to, and it is reasonably probable it did, influence the verdict. Townsend v. Mid-America Pipeline Co., Iowa, 168 N.W.2d 30, filed May 6, 1969; Fordyce v. Cappel, 257 Iowa 763, 765, 133 N.W.2d 664, 665; Mead v. Scott, 256 Iowa 1285, 1290, 130 N.W.2d 641, 644; Hackaday v. Brackelsburg, 248 Iowa 1346, 1350, 85 N.W.2d 514, 517; Mongar v. Barnard, 248 Iowa 899, 908, 82 N.W.2d 765, 771, 772; Fagen Elevator v. Pfiester, 244 Iowa 633, 641, 56 N.W.2d 577, 581.

Misconduct of the jury is not a ground for new trial unless it "materially affects * * * substantial rights" of the "aggrieved party" or "prevented the movant from having a fair trial". Rule 244, R.C. P.; Mead v. Scott, supra. See also 10 Drake Law Review 126, 129.

■ The trial court has wide discretion in determining whether alleged misconduct of the jurors is prejudicial. Unless abuse of discretion is clearly shown his decision should not be reversed. Rancho Grande, Inc. v. Iowa State Highway Com'n, Iowa, 156 N.W.2d 293, 299; Mead v. Scott, supra; Harden v. Illinois Central R. Co., 253 Iowa 341, 343, 112 N.W.2d 324, 325; Hutchinson v. Fort Des Moines Com. Servs., 252 Iowa 536, 543, 107 N.W.2d 567, 571; Bashford v. Slater, 250 Iowa 857, 867, 96 N.W.2d 904, 910; Turner v. Hansen, 247 Iowa 669, 674, 75 N.W.2d 341, 343, and cited authorities.

The annotation "Use of Books in Jury Room", 54 A.L.R.2d 738, at pages 738, 739, states: "There are few cases raising the question herein discussed, and most of them have involved a jury's use of a dictionary. Although these few cases, in many of which the courts disposed of the question in a summary manner, reveal some conflict in principle, most of the conflict is one of result only. Most of the jurisdictions which have passed upon the question proceed on the basis, more often implied than expressed, that prejudice to the complaining party is not presumed but must

affirmatively appear in order to require or justify a reversal or a new trial, *and in most of the cases it has been found that no prejudice resulted. * * *"* (Emphasis added)

We have not previously been presented with the question of whether use by the jury of a dictionary or definitions therefrom requires granting a new trial. We have however considered the problem in regard to unauthorized use of books or pamphlets by jurors during deliberation.

In Mongar v. Barnard, supra, 248 Iowa 899, 82 N.W.2d 765, we held use in the jury room of a ten-page pamphlet published by the state bar association entitled "You're on the Jury" did not require granting a new trial.

In Fagen Elevator v. Pfiester, supra, 244 Iowa 633, 56 N.W.2d 577, which involved a motor vehicle accident, we affirm the trial court's refusal to grant a new trial where it appeared the jurors had at least two copies of a printed book, "The Iowa Drivers' Guide" issued by the state department of public safety, and certain jurors examined and read aloud from the books. At page 642, 244 Iowa, page 582, 56 N.W.2d, we said: "The situation here is somewhat like that where jurors consult a dictionary during their deliberations. This has been held not to require a new trial. 66 C.J.S. New Trial § 58 d (1), page 182; 30 Am.Jur., New Trial, § 84, page 98."

In Dulaney v. Barnes, 218 Ala. 493, 119 So. 21, a will contest on the grounds of undue influence, the jurors secured Webster's Elementary School Dictionary and during their deliberations had before them the definitions of undue influence and confidential. At page 25, 119 So., the Alabama Supreme Court states: "Such incident, as a rule, is not ground for new trial if it does not appear that the matter was of a character to prejudice the unsuccessful party.

  *  *  *  *  *  *

"The definition of words in our standard dictionaries is taken as a matter of common knowledge, which the jury is supposed to possess. There is nothing to indicate that the jury did not give full effect to the definition of 'undue influence' as a legal term given by the judge in his charge." This case strongly supports the ruling of the trial court here.

In the case at bar the bill of exceptions shows a juror during trial procured dictionary definitions of "undue" and "undue influence" and later in the jury room during deliberations read them to the other jurors and they were compared with the definition of undue influence as given in court's instructions. They were not identical. There is no showing the dictionary definitions were different than the jurors' common knowledge of the terms.

It is presumed the jury obeyed the court's instructions. Rancho Grande, Inc. v. Iowa State Highway Comm., Iowa, 156 N.W.2d 293, 299; Beal v. Iowa State Highway Comm., 209 Iowa 1308, 1311, 230 N.W. 302, 303, and citations. There is no indication here the jury did not give full consideration to the definitions given in the court's instructions.

The record before us does not support a finding of prejudicial jury misconduct and a holding the trial court abused his discretion in refusing to grant a new trial.

VIII. Another complaint of proponents is that inasmuch as the court directed a verdict in favor of Gladys Spring holding as a matter of law she did not unduly influence testator, the will should be upheld as to her. They cite In re Estate of Ankeny, 238 Iowa 754, 767, 28 N.W.2d 414, 420, 421, in which we state: "See, also, 69 A.L.R. 1129, in which the text, supported by many authorities, states: 'The authorities, with but few exceptions, support the general proposition that parts of a will may be held valid and enforceable, notwithstanding the fact that other parts have been affected by undue influence and are invalid; provided, however, that the

parts so affected are separable, so that the will remains complete and intelligible in itself.'"

■ We have recognized such principles but this matter is raised here for the first time. Proponents treated the will as wholly good or bad in its pleadings, proofs and arguments. The trial court instructed on the basis of such treatment. Proponents cannot now raise the issue. In re Estate of Eiker, 233 Iowa 315, 327, 328, 6 N.W.2d 318, 325.

IX. In Divisions X through XIV of their briefs proponents list some 30 instances wherein they contend prejudicial error occurred in admission of evidence of contestant. The claimed errors are lumped together and briefly argued. In deference to the parties we have examined each objection and ruling with care. We find all rulings, save one, were within the court's sound, judicial discretion in ruling on evidence. See Olsen v. Corporation of New Melleray, 245 Iowa 407, 425, 426, 60 N.W.2d 832, 843, and citations: 3 Page on Wills, sections 29.115, 29.123; 40 A.L.R. 2d 15, 102.

■ The exception mentioned, is the short hypothetical question which referred to an autopsy report. Dr. Nord referred to the contents of an autopsy report over timely objection that his testimony was not the best evidence. No autopsy report was admitted in evidence and no prior or subsequent evidence specifically showed the autopsy report said the sclerosis "affected the brain". This error was not so prejudicial as to require a new trial.

The court's ruling on the single objection based on section 622.4, Code, 1966 was proper.

■ X. Proponents offered exhibits C–7 (a death certificate), D–8 (a letter) and D–3 (petition for appointment of voluntary guardian) into evidence but all were ob-

jected to and excluded. Exhibits C–7 and D–9 have not been certified to this court or copied into the record. We cannot intelligently consider error predicated on rejection of exhibits not available to us.

Exclusion of the application for appointment of guardian was not prejudicial error under the record made.

XI. Proponents object to failure of the court to give three requested instructions and to the giving of instructions 3, 7, 8 and 9. We have considered both complaints carefully. The instructions as given sufficiently cover the points raised by proponents both in their requested instructions and in their record objections to the instructions as given. We find no error on this basis.

No reversible error is shown.

Affirmed.

GARFIELD, C. J., and LARSON, SNELL and STUART, JJ., concur.

BECKER and RAWLINGS, JJ., dissent. MASON and LeGRAND, JJ., join in division II of the dissent.

BECKER, Justice.

I respectfully dissent.

I. While I disagree with the majority's treatment of Division IV on cross-examination, the disagreement is not important enough to occasion a dissent.

II. The real area of disagreement lies in Division VII. The bill of exceptions adequately shows that during the trial one of the jurors (subsequently named foreman) [1] procured dictionary definitions of the words "undue" and "undue influence" and brought them into the jury room during deliberations. The dictionary definition was read to the jury at least twice and compared with the legal definition of the term as it was given to the jury in the court's instructions. While the dictionary definitions procured were not set forth in the

---

1. This was the same juror who was seen talking to the witnesses on two occasions.

record, two conclusions are inescapable: first, the dictionary definition was different from that given by the court, and two, as the foreman by affidavit stated: " * * * *the one set forth in the Instructions cast a greater burden on the plaintiff than if the Jury had confined themselves to the definition as set forth in the dictionary.*" (Emphasis added.)

Mongar v. Barnard, 248 Iowa 899, 82 N. W.2d 765, 771, 772, states: " 'In order to justify a new trial on the basis of misconduct of jurors it must appear the misconduct was calculated to, and it is reasonably probable did, influence the verdict.' Krieg v. Grant, 248 Iowa 396, 405, 80 N.W.2d 724, 729. See also Fagen Elevator v. Pfiester, 244 Iowa 633, 641, 56 N.W.2d 577, 581, and citations."

The bill of exceptions and affidavits on which the motion for a new trial is based may show matter which does not essentially inhere in the verdict; but how these extraneous matters affected the jurors' vote may not be considered.[2] Harden v. Illinois Central Railroad Company, 253 Iowa 341, 343, 112 N.W.2d 324. Given the facts as to what happened, it is for the trial court to determine whether the claimed misconduct was calculated to, and reasonably probably did, influence the verdict. Bashford v. Slater, 250 Iowa 857, 96 N.W.2d 904. The trial court has considerable discretion in determining whether the conduct is of such stature as to require a new trial. This discretion is not unlimited and this court has reversed and remanded for new trial when a chart showing stopping distances of automobiles was improperly taken into the jury room by one of the jurors. Harden v. Illinois Central Railway, supra.

In Fagan Elevator v. Pfiester, 244 Iowa 633, 56 N.W.2d 577, 582, we considered a case where two copies of the Iowa Driver's Guide were found in the jury room after verdict was returned. We held prejudicial

error had not occurred. By way of illustration we said: "The situation here is somewhat like that where jurors consult a dictionary during their deliberations. This has been held not to require a new trial. 66 C.J.S. New Trial § 58 d (1), page 182; 39 Am.Jur., New Trial, § 84, page 98."

The Corpus Juris Secundum citation also notes a case where consultation of a dictionary was held to constitute prejudicial misconduct. This matter has since been exhaustively reviewed in an annotation at 54 A.L.R.2d 738, Use of Books in Jury Room. Most of the books used were dictionaries. The cases are substantially split on the prejudicial effect of such alleged misconduct. As noted by the annotator at least part of this divergence may be traced to a split of authority as to whether such conduct is presumptively prejudicial or whether such conduct must be affirmatively shown by the complaining party to be prejudicial.

This court has not presumed prejudice in similar cases but has examined what has occurred and determined whether it is reasonably probable prejudice occurred. Rancho Grande, Inc. v. Iowa State Highway Comm., Iowa. 156 N.W.2d 293.

Where a dictionary, which was not admitted in evidence, was given to the jury by an officer of the court, the Illinois appellate court in Gertz v. Bass, 59 Ill.App.2d 180, 208 N.E.2d 113, 115, 116 said: "* * * the dictionary contained definitions of terms which were essential to a decision in the case, and which were substantially different from the technical legal definitions of those terms which the jury was properly instructed to apply in arriving at their verdict.

* * * * * *

"In this case, we believe that the error is clear, that the danger of prejudice is great and that the proof of actual prejudice is difficult. Although we have no direct way of knowing from the record what ac-

2. Thus the majority's sentence: "There is no indication here the jury did not give full consideration to the definitions given in the court's instruction." is highly unfair. Such evidence is immaterial as it tends to show matters that we have consistently held to inhere in the verdict.

tual use was made of the dictionary or what effect its use may have had, we cannot agree with the defendants that it is only pure speculation that the jury may have consulted the dictionary to obtain definitions of the crucial words in the case. It is reasonable to infer from the fact that the jury specifically requested the dictionary, that they made use of the volume in determining the meaning of the crucial terms and were influenced thereby to the prejudice of the plaintiffs." Accord: In re Collins' Will, 18 N.J.Misc. 492, 15 A.2d 98; Daniels v. Barker, 89 N.H. 416, 200 A. 410.

The facts are stronger here. The dictionary definition used involved a word that had been previously and authoritatively defined by the trial court. It was the duty of the jury to use the definition supplied or seek further clarification. The definition involved the very essence of the case. Indeed, it constituted the body of the claimed wrong as no other issue was submitted.

The use of the words to express the legal concepts that order our society is, at best, a difficult and dangerous business. The difficulty is accentuated when the legal profession attempts to explain the concepts to a jury of laymen in understandable, yet legally correct, language. The process must include definitions of the terms used. It makes little sense to me to spend great effort on instructions, including definitions, and then allow an officious juror to substitute a dictionary definition for that of the court.

In Iowa we do not inquire whether the misconduct of the juror did, in fact, influence the jury. This matter of inquiry necessarily involves questions and answers that inhere in the verdict. In this respect our law differs from that of Alabama cited by the majority.

Our case law is closer to that of New Jersey. See In re Collins' Will, 18 N.J. Misc. 492, 15 A.2d 98, 100–101, which is directly contra to the Alabama case. The Circuit Court said: " * * * Assuredly,

the use of a simplified English dictionary to explicate established principles of law as expressed in language approved by our courts is beyond the avowed scope of such a work and in such use, misguidance is more than probable.

*    *    *    *    *    *

"It is the duty of the trial judge to expound the law to the jury and to afford the attorneys of the litigants an opportunity to hear the instructions and to register exceptions to any instructions considered to be erroneous. It is the duty of the jury to accept the law of the case as expressed in the language chosen by the court.

*    *    *    *    *    *

"The power to grant a new trial is essentially remedial in character. In the present case the issue relating to undue influence was exceedingly controversial. In all the circumstances it would seem that the evidence on this branch of the case was not considered with an adequate understanding of the pertinent rules of law."

In Iowa we determine whether the misconduct was calculated to, and reasonably probably did, influence the verdict. If the extraneous definition was not calculated to influence the verdict why did the juror copy it out of the dictionary? Why did he show or read it to the other jurors?

For me at least the affidavit of the offending juror answers the second part of the inquiry; i. e., that it reasonably probably did influence the verdict. " * * * the one (definition) set forth in the Instructions cast a greater burden on the plaintiff *than if they had confined themselves* to the definition set forth in the dictionary." (Emphasis added.) I think it is reasonably probable, (1) the jury considered both definitions, and (2) such action did improperly influence their decision. I would grant a new trial on this ground.

RAWLINGS, J., joins in this dissent.

MASON and LeGRAND, JJ., join in division II of this dissent.